**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Franklin D. WILSON and Gary Wayne Bugbee, Defendants-Appellants.**

**No. 77–5416.**

United States Court of Appeals, Fifth Circuit.

June 15, 1978.

Rehearing and Rehearing En Banc Denied Aug. 10, 1978.

---

Ralph J. Hunstein, Atlanta, Ga. (Court-appointed), for Wilson.

Robert E. Whitley, Gregory T. Presmanes, Atlanta, Ga., for Bugbee.

William L. Harper, U. S. Atty., Robert A. Boas, Julie Carnes, Asst. U. S. Attys., Atlanta, Ga., for plaintiff-appellee.

Before HILL, RUBIN, and VANCE, Circuit Judges.

JAMES C. HILL, Circuit Judge:

Gary Wayne Bugbee was convicted as the principal and Franklin D. Wilson was convicted as an aider and abettor for selling Dilaudid (hydromorphone hydrochloride), a schedule II controlled substance, in violation of Title 21, United States Code, Section 841(a)(1) and Title 18, United States Code, Section 2. Bugbee and Wilson argue that the district court twice committed reversible error: first, by allowing the jury's use of a written transcript and tape recording of a drug related conversation between Bugbee and the government's confidential informant and second, by allowing the government's confidential informant to testify concerning a drug transaction extraneous to the crime charged in the indictment. Finding no harmful error in the district court's evidentiary rulings, we affirm.[1]

I.

Viewed most favorably to the government, *see Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942), the evidence showed the following sequence of events.

The government's chief witness at trial, Gaskin, was a confidential informant with the Drug Enforcement Administration. Gaskin testified that he met with DEA agents in Atlanta, Georgia, and agreed to wear a radio transmitter during a planned meeting with Bugbee. On October 20, 1976, Gaskin went to Bugbee's apartment to discuss the possible sale by Bugbee to Gaskin of Dilaudid. A tape recording was made of this meeting, and the tape was introduced into evidence at trial.

---

1. Since we find no harmful error, we need not decide whether, in the trial of these codefendants, harmful error with respect to the principal was also harmful error with respect to the aider and abettor. *See Hamilton v. United* States, 409 F.2d 928 (5th Cir. 1969); *Rosencranz v. United States*, 334 F.2d 738 (1st Cir. 1964); *Cucchia v. United States*, 17 F.2d 86 (5th Cir. 1927).

On October 22, 1977, Gaskin returned to Bugbee's apartment, under government surveillance. Shortly after Gaskin arrived, Bugbee left his apartment to make a telephone call; and then he met Wilson in a parked car. Bugbee returned to the apartment and told Gaskin that he would be able to supply the Dilaudid. When Bugbee refused to deal directly with Gaskin's "buyer," who was, in fact, a DEA agent waiting outside the apartment, Gaskin briefly left the apartment to get money with which to make the purchase himself.

After obtaining two hundred dollars in cash from the DEA agent, Gaskin began to walk back toward Bugbee's apartment. As he approached the apartment, Gaskin became aware of someone walking near him who apparently was going to Bugbee's apartment. He had never seen the individual before. When they reached the apartment, both knocked, and the individual introduced himself as "Tommy." Once inside, Tommy told Bugbee that he wished to purchase some Dilaudid. After a brief discussion, Bugbee left the apartment for the second time and returned a few minutes later. Upon Bugbee's return, Tommy took out some money and Bugbee asked him to go into the back room. A few minutes later, Bugbee and Tommy came out of the back room. Bugbee then handed Gaskin a cellophane bag containing ten tablets of Dilaudid, from Wilson's lawful prescription for a total of forty tablets which had been filled the day before.

## II.

Defendants urge that the district court erred in allowing the jury to listen to the tape while reading the government's transcript of the October 20th meeting between Bugbee and Gaskin. They contend that the government's transcript improperly supplied otherwise unintelligible portions of the taped conversation and the tape itself was so inaudible and unintelligible that no accurate transcript could have been prepared. Thus, their assertion of error encompasses both the quality of the recording and the quality of the transcript.

Tape recordings which are only partially unintelligible are admissible unless the unintelligible portions are so substantial as to render the recording as a whole untrustworthy. The initial decision whether to admit into evidence a recording containing inaudible or unintelligible portions is committed to the sound discretion of the district court. *United States v. Clements*, 484 F.2d 928 (5th Cir. 1973), *cert. denied*, 415 U.S. 991, 94 S.Ct. 1591, 39 L.Ed.2d 888 (1974); *United States v. Avila*, 443 F.2d 792 (5th Cir.), *cert. denied*, 404 U.S. 944, 92 S.Ct. 295, 30 L.Ed.2d 258 (1971); *Johns v. United States*, 323 F.2d 421 (5th Cir. 1963); *Addison v. United States*, 317 F.2d 808 (5th Cir. 1963), *cert. denied*, 376 U.S. 905, 84 S.Ct. 658, 11 L.Ed.2d 605 (1964). Here, the district court listened to the tape and recognized that some of the conversation was not intelligible, but found that a sufficient portion was understandable and had enough probative value to warrant its admission. After carefully listening to the tape, we agree with the district court's decision to admit the tape. While some portions of the recording are inaudible and unintelligible, much of it can be heard clearly. Certainly, defendants have not shown an abuse of the district court's discretion.

The propriety of the use of a transcript when playing a recording for the jury is an issue somewhat distinct from the issue of the admissibility of the tape itself. In *United States v. Onori*, 535 F.2d 938 (5th Cir. 1976), this Court clearly approved the admission of an authenticated transcript of a tape recording for the limited purpose of aiding the jury in understanding the recording. Such a transcript may be helpful either to identify the speakers or to understand portions which are difficult to hear. Recognizing the value of a transcript, in *Onori* this Court established a procedure for accommodating the potential for variance in adversaries' transcripts. *See generally United States v. Rochan*, 563 F.2d 1246 (5th Cir. 1977); *United States v. Onori, supra.* Initially, the district court and the parties should make an effort to produce an "official" or "stipulated" transcript, one which

satisfies all sides. If such an "official" transcript cannot be produced, then each side should produce its own version of a transcript or its own version of the disputed portions. In addition, each side may put on evidence supporting the accuracy of its version or challenging the accuracy of the other side's version. Since the jury must always reconcile the discrepancies in the transcript(s) against the recording itself, the district court need not listen to the tape or decide whether a transcript is accurate before the transcript is given to the jury and the recording is played.

Wilson and Bugbee do not take issue with the propriety of these procedures. Instead, they argue that the tape recording of the Gaskin-Bugbee conversation was so unintelligible that neither the government nor the defense could prepare an accurate transcript. They further argue that because the tape was so substantially unintelligible they could not even effectively challenge the accuracy of the government's transcript, let alone prepare a competing defense version. Therefore, they would have us conclude that the recently established *Onori* principles do not apply and prior judicial standards for the use of transcripts of recordings control this case.

We do not follow defendants' logic to their argued conclusion for two reasons. First, we conclude that the quality of this recording was not so poor as to render the *Onori* principles inapplicable. Second, even assuming that *Onori* does not apply, the district court adequately complied with the pre-*Onori* procedure for the use ·of transcripts of recordings.

The district court determined that the tape was not so substantially unintelligible to render it entirely untrustworthy. Once we have held the tape admissible, defendants' argument falls under its own weight since it necessarily follows that the tape was sufficiently intelligible for challenging specific portions of the government's transcript or preparing a defense version. Once we have concluded that the defendants could have challenged specific portions of the government's transcript or prepared an alternative version, it follows that they cannot be heard to complain on appeal because they failed to take advantage of their trial opportunity. *See United States v. Chiarizio,* 525 F.2d 289 (2d Cir. 1975), *cited in United States v. Onori, supra* at 948–49. Rather than challenge specific portions of the government's transcript or prepare a defense version, the defendants chose to attack the entirety of the government's transcript based on their contention that the tape was wholly unintelligible. This issue, in effect, was ultimately reserved for the jurors when the district court instructed them that their own understanding of the tape would control over the government's transcript.

Defendants' efforts to distinguish *Onori* and to establish reversible error under the pre-*Onori* case law must, likewise, fail. Even though they have not been successful in distinguishing *Onori,* had they been successful in their attempt, we would affirm under our pre-*Onori* precedent. Defendants are correct to point out that this Court, in *Onori,* recognized a distinction between specific and general challenges to the accuracy of a transcript. However, defendants overlook another point made in *Onori.* This Court recognized only a previous *suggestion* that a prior judicial determination of accuracy was *desirable* before the jury uses a transcript, in the face of general attacks on its accuracy, citing *Fountain v. United States,* 384 F.2d 624 (5th Cir. 1967), *cert. denied sub nom., Marshall v. United States,* 390 U.S. 1005, 88 S.Ct. 1246, 20 L.Ed.2d 105 (1968). And, this Court went on to observe that the prior precedents did *not* hold a judicial determination of accuracy was a *sine qua non* of transcript use. *United States v. Onori, supra* at 948. Thus, the pre-*Onori* case law would not seem to require a specific prior judicial determination of transcript accuracy as long as the jurors are left with the impression that their understanding of the recording controls over any transcript, as was so here. Further, even assuming that the pre-*Onori* case law, *e. g. Fountain v. United States, supra,* controls this appeal and did require some prior judicial determination of transcript

accuracy, the district court made such a determination here based on Gaskin's authentication of the transcript and comparison between the transcript and the tape. *See United States v. Juarez,* 573 F.2d 267 (5th Cir. 1978); *United States v. Rochan, supra* at 1251; *Fountain v. United States, supra* at 632.

### III.

The defendants urge that Gaskin's testimony concerning Bugbee's alleged Dilaudid transaction with Tommy was irrelevant, inadmissible under any rule of evidence, and so prejudicial as to constitute harmful error. We do not find harmful error.

### A.

As a preface, we observe that this question need never have been raised but for the overzealousness of the prosecutor. We are reluctant to criticize trial attorneys from our advantageous position of hindsight jurists. We recognize that a criminal trial is enveloped in an electric, adversarial atmosphere. But, the prosecutor must be more than an advocate for conviction. The prosecutor must be an advocate for Justice. Over forty years ago, Mr. Justice Sutherland observed:

> The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor—indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one. *Berger v. United States,* 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935).

*See also Handford v. United States,* 249 F.2d 295, 296 (5th Cir. 1957).

We do not purport to cast aspersions on the integrity or good faith of the prosecutor here. However, we do recognize this prosecution as another example of an all too frequent phenomenon. Caught up in the adversary process and the emotional atmosphere of trial combat, prosecutors too often pursue strategies with a singular determination rather than with a careful deliberation. Reasoned reflection gives way to reckless reaction. And, the war is often lost as a result of a battle won. Indeed, success in a trial skirmish often proves to have been a Pyrrhic victory. Otherwise proper convictions of concededly guilty defendants must be reversed because the prosecutor won an evidentiary point along the course of a long, complex and costly trial. This case is an example of such prosecutorial shortsightedness. A narrowly focused *trial* strategy, bent upon the admission of evidence of the Tommy transaction, has rendered the conviction somewhat vulnerable in the larger context of *appellate* review. While we find no reversible error, we do consider the tack pursued here unnecessary and, worse, unnecessarily risky. We understand that a prosecutor loathes an acquittal, which would immunize from further prosecution, over all else. But we cannot condone the blind pursuit of a conviction achieved with the subliminal strategy that, at best, any error will be considered harmless, and, at worst, a tainted conviction will be reversed and a new trial ordered providing a second opportunity to gain a valid conviction. The discretion afforded the prosecutor must be exercised with deliberation. It does not serve society's interests to attempt to admit all evidence damning to the defendant with the idea that the appellate court will either approve the conviction or reverse and indicate which evidence to omit at retrial. That is a wasteful abdication of the prosecutor's responsibility. The prosecutor is an advocate for Justice. Justice includes the acquittal of the innocent, but Justice also includes the conviction of

the guilty. Ironically, by being overzealous the prosecutor may achieve the immediate goal of a guilty verdict yet, in the process, the conviction is rendered vulnerable to eventual appellate reversal. The prosecutor's advocacy for the immediate conviction must be tempered by an advocacy for the just conviction which will withstand appellate review. When an otherwise proper conviction must be overturned because of prosecutorial overzeal, Justice, a just conviction, has been postponed to a second trial or, perhaps, prevented altogether. The immediate success in a trial confrontation may prove too costly to society when the eventual reversal occurs.

This is not a case which we must reverse in order to do Justice. However, the defendants never would have been able to mount this attack on their conviction had the prosecutor not provided this weapon. The prosecution had the actual purchaser of the Dilaudid, Gaskin, testify that he bought it from Bugbee. This version was corroborated by a tape recording of Bugbee and Gaskin negotiating the deal. The whole sequence of events was further corroborated by several DEA agents who surveilled the course of dealings. The only defense, that Gaskin was lying to wreak revenge on Bugbee, gave the jury a credibility question easily resolved against Bugbee. In this context, of what significance to the prosecution was the Tommy transaction? We think little, if any. Was the immediate success in the evidentiary confrontation worth ultimately jeopardizing the convictions? We think not. And, we think that the prosecutor would agree.

### B.

■ Because of prosecutorial overzealousness, we have the defendants' contentions regarding the Tommy transaction to consider. Initially, we observe that Gaskin's testimony concerning the Tommy transaction formed an "integral and natural part" of his account of the circumstances surrounding the charged offense. The Tommy transaction was "part of the background facts surrounding the commission of the crime." Here the challenged evidence seemed to have been introduced merely to complete Gaskin's account of his dealings with Bugbee, and it cannot be convincingly contended that the prosecution improperly sought to establish a general propensity to commit the crimes charged. Arguably, then, this is *not* the kind of evidence to which the general rule excluding evidence of extraneous offenses applies. *See generally United States v. Bloom*, 538 F.2d 704, 709 (5th Cir.), *cert. denied*, 429 U.S. 1074, 97 S.Ct. 814, 50 L.Ed.2d 792 (1976) (citations therein). Courts and treatise writers have come to recognize an exception to the general rule of inadmissibility, by allowing the introduction of evidence of other criminal activity in order to complete the story of the crime on trial. *See, e. g., United States v. Howard*, 504 F.2d 1281 (8th Cir. 1974); *United States v. Stubblefield*, 408 F.2d 309 (6th Cir. 1969); *United States v. Bucciferro*, 274 F.2d 540 (7th Cir.), *cert. denied*, 362 U.S. 988, 80 S.Ct. 1076, 4 L.Ed.2d 1021 (1960). *See generally McCormick, Evidence* § 190 at 448 (2d ed. 1972); 1 *Wigmore on Evidence* § 218 at 719–22 (3d ed. 1940). This Court has recognized such an exception, sometimes referred to by the misnomer "res gestae." *See, e. g., United States v. Blewitt*, 538 F.2d 1099 (5th Cir.), *cert. denied*, 429 U.S. 1026, 97 S.Ct. 650, 50 L.Ed.2d 629 (1976); *United States v. Bloom, supra; Lipscomb v. Estelle*, 507 F.2d 708 (5th Cir. 1975); *United States v. Goodwin*, 492 F.2d 1141 (5th Cir. 1974); *United States v. Hughes*, 441 F.2d 12 (5th Cir.), *cert. denied*, 404 U.S. 849, 92 S.Ct. 156, 30 L.Ed.2d 88 (1971); *United States v. Hatcher*, 423 F.2d 1086 (5th Cir. 1970); *Cassady v. United States*, 395 F.2d 205 (5th Cir. 1968); *Nunez v. United States*, 370 F.2d 538 (5th Cir. 1967); *Shelton v. United States*, 205 F.2d 806 (5th Cir.), *cert. denied*, 346 U.S. 892, 74 S.Ct. 230, 98 L.Ed. 395 (1953); *Logan v. United States*, 192 F.2d 388 (5th Cir. 1951). One past application of this doctrine permitted the admission of evidence of a narcotics sale other than the one named in the indictment when the two sales constituted practically one transaction. *See United States v. Lee*, 292 F.2d 499 (2d Cir. 1961),

*cert. denied*, 375 U.S. 946, 84 S.Ct. 354, 11 L.Ed.2d 276 (1963); *United States v. McCartney*, 264 F.2d 628 (7th Cir.), *cert. denied*, 361 U.S. 845, 80 S.Ct. 98, 4 L.Ed.2d 83 (1959); *Barnes v. United States*, 8 F.2d 832 (8th Cir. 1925); *James v. United States*, 279 F. 111 (5th Cir.), *cert. denied*, 260 U.S. 722, 43 S.Ct. 13, 67 L.Ed. 481 (1922). *Cf. United States v. Alonzo*, 571 F.2d 1384 (5th Cir. 1978).

We need not analyze the effect of the Federal Rules of Evidence on this exception to the general rule. *See* Fed.R.Evid. 403, 404(b); *Carter v. United States*, 549 F.2d 77 (8th Cir. 1977); *United States v. Bloom, supra*; *United States v. Blewitt, supra*; *Lipscomb v. Estelle, supra.*[2] Whether or not the complete account of an incident which establishes other misconduct while directly proving the offense charged could ever be so prejudicial as to require reversal, this is not such a case.

### C.

Likewise, despite the defendants' arguments, the facts here do not require reversal under the general rule which excludes evidence of extraneous crimes. Although we are not fully convinced that the district court abused its discretion in admitting evidence of the Tommy transaction, *see United States v. Evans*, 572 F.2d 455 (5th Cir. 1978); *United States v. Myers*, 550 F.2d 1036 (5th Cir. 1977); *United States v. Brown*, 547 F.2d 1264 (5th Cir. 1977); *United States v. Bloom, supra* at 709, we need not reach that question.[3]

The safeguards against the wholesale admission of evidence of extraneous offenses are designed to minimize the danger that a jury will infer guilt of the charged offense from the evidence of the prior offense or bad act or will seek to punish the defendant for the prior offense regardless of his innocence of the charged offense. *United States v. Beechum, supra* at 491. *See also United States v. Broadway*, 477 F.2d 991,

994 (5th Cir. 1973); *Weiss v. United States*, 122 F.2d 675 (5th Cir.), *cert. denied*, 314 U.S. 687, 62 S.Ct. 300, 86 L.Ed. 550 (1941). With this policy in mind, we cannot conclude that Gaskin's testimony concerning the Tommy transaction was so prejudicial as to be reversible error, even assuming that it was error. As we have already noted, Gaskin's testimony regarding the Tommy transaction was of little value to the prosecution. It provided only an antecedent to the prosecutor's inconsequential accounting for the forty pills supplied in the prescription in his closing argument. On the other hand, the potential of harmful and undue prejudice was also minimal. For the jury to consider that Bugbee actually sold Dilaudid to Tommy, Gaskin's credibility had to be accepted. If Gaskin was considered credible, his other direct testimony regarding the drug purchased from Bugbee, during the same episode, would establish the actual crime charged.

In view of the overwhelming evidence of guilt, any evidentiary error can be considered, at most, harmless. Fed.R.Crim.P. 52(a); Fed.R.Evid. 103(a)(1); *Kotteakos v. United States*, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). *See United States v. Evans, supra* at 484 n.40; *United States v. Fortune*, 513 F.2d 883 (5th Cir.), *cert. denied*, 423 U.S. 1020, 96 S.Ct. 459, 46 L.Ed.2d 393 (1975); *United States v. Roland*, 449 F.2d 1281 (5th Cir. 1971); *Driver v. United States*, 441 F.2d 276 (5th Cir. 1971). *Cf. United States v. Bell*, 535 F.2d 886 (5th Cir. 1976); *Helton v. United States*, 221 F.2d 338 (5th Cir. 1955).

### IV.

The final measure is prejudice. We are ever mindful of Mr. Justice Frankfurter's sage remonstrance in *Johnson v. United States*, 318 U.S. 189, 202, 63 S.Ct. 549, 555, 87 L.Ed. 704 (1943) (concurring opinion):

---

**2.** *See also* note 3, *infra.*

**3.** Given the result we reach, we also need not divine how present procedural problems in this

area of evidence law will be resolved. *See United States v. Beechum*, 555 F.2d 487 (5th Cir.), *rehearing en banc granted*, 563 F.2d 782 (1977).

In reviewing criminal cases, it is particularly important for appellate courts to re-live the whole trial imaginatively and not to extract from episodes in isolation abstract questions of evidence and procedure. To turn a criminal appeal into a quest for error no more promotes the ends of justice than to acquiesce in low standards of criminal prosecution.

At trial, the prosecution convinced the jury that the defendants were guilty. On appeal, the defendants have not convinced us that there was prejudicial error. "A defendant is entitled to a fair trial but not a perfect one." *Lutwak v. United States*, 344 U.S. 604, 619, 73 S.Ct. 481, 490, 97 L.Ed. 593 (1953). Here the defendants had a fair trial.

AFFIRMED.

### ON PETITION FOR REHEARING AND PETITION FOR REHEARING EN BANC

PER CURIAM:

The Petition for Rehearing on behalf of appellant Wilson, only, is DENIED and no member of this panel nor Judge in regular active service on the Court having requested that the Court be polled on rehearing en banc, (Rule 35 Federal Rules of Appellate Procedure; Local Fifth Circuit Rule 12) the Petition for Rehearing En Banc is DENIED.

As a postscript to this denial of rehearing, we add the following observation to our prior opinion, on our own motion.

In Part III. A. of our opinion, we used this case as a platform for expressing our concern about a recurring phenomenon. As we there noted, we have observed, all too often, overzealous advocacy by the prosecutor resulting in the "seeding" of a record with unnecessary rulings upon which reviewable claims of error are based. Simply because we make these observations in this case is not meant to unduly chastise the prosecutor here. We do not wish to "visit the sins" of all overzealous prosecutors on government counsel in this case. Indeed, as we are careful to point out in our opinion,

this is not the prototypic example of this phenomenon. Our holding shows as much: our ultimate treatment of the evidence of the "Tommy transaction" demonstrates that the prosecutor's (not counsel who argued the appeal) success in injecting the matter was of no harmful moment. Yet, we believe that this case was an appropriate platform for our observations: objection was made to somewhat extraneous evidence; the trial judge was required to rule; error was predicated on that ruling. And, all this resulted from the prosecutor's having won a point of so little value to the prosecution that, as we have held, it did not harm the defense.