[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
DEC 21, 2010
JOHN LEY
CLERK

_____

No. 09-15174
Non-Argument Calendar

_____

D. C. Docket No. 08-20751-CR-RWG

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

RYAN GAYLE,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(December 21, 2010)

Before HULL, MARTIN and FAY, Circuit Judges.

PER CURIAM:

Ryan Gayle appeals his convictions and sentences for importation of 1,000 kilograms or more of marijuana, in violation of 21 U.S.C. § 952(a) and 18 U.S.C. § 2, and conspiracy to possess with intent to distribute 1,000 kilograms or more of marijuana, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(vii) and 846.

Gayle raises nine issues on appeal. First, he argues that three black jurors were improperly excluded from the jury, in violation of *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). Second, he claims that a fourth juror was biased in favor of the government's primary witness, and, thus, was improperly seated on the jury. Third, he claims that the government violated public policy by using a confidential informant ("CI") who engaged in criminal activity during the course of the investigation and prosecution, and that the district court improperly limited his cross-examination of the CI. Fourth, he asserts that the district court followed improper procedures regarding the admission of his and the government's competing transcripts of various recorded conversations. Fifth, Gayle argues that the evidence was insufficient to support his convictions. Sixth, he asserts that the government improperly commented on his decision not to testify, and that cumulative error arises from various comments made by the district court during the trial. Seventh, he argues that the district court improperly altered a jury instruction on the elements of the conspiracy charge. Eighth, he

argues that the district court improperly denied his motion to disqualify the prosecutor from participating in the sentencing hearing. Finally, he claims that he was improperly sentenced on the basis of more than 1,000 kilograms of marijuana. The government asserts that Claims 2 and 7 are predicated on invited error, and, thus, they are unreviewable on appeal.

For the reasons set forth below, we affirm.

I.

In November 2006, Lloyd Garrick, an Amerijet Airlines warehouse employee and a CI for Immigration and Customs Enforcement ("ICE"), informed ICE agents that Gayle had recruited him to assist with the importation of marijuana from Jamaica. Gayle informed Garrick that he was bringing 500 pounds of marijuana into the United States in unmanifested cargo on an Amerijet plane. He offered Garrick $50,000 to divert the cargo from the warehouse onto a truck. After the plan was in place, Gayle brought the truck's driver to the warehouse and showed him where to park. In preparation for the shipment, Gayle gave Garrick a piece of paper identifying the consignor and consignee of the shipment and stating that the shipment would consist of 120 pieces of cargo. He told Garrick that he had been in touch with a contact named "Jugo" to ensure that the cargo would be loaded onto the plane in Jamaica.

3

On November 30, 2006, after the plane left Jamaica, Garrick discovered that the shipment consisted of 5,000 pounds of manifested cargo. When he called Gayle and expressed surprise at the size of the shipment, Gayle initially said, "That's what I told you," and indicated that all of the boxes should be pulled. He then went to see Garrick in person, called a contact in Jamaica named "Peter," and had Peter confirm that all 120 boxes in the 5,000-pound shipment should be pulled from the warehouse. Gayle asked Garrick what had happened to "Julio," the fictional assistant Garrick had invented. Gayle repeatedly "begg[ed]" Garrick to pull the entire load of cargo, and he promised several times to "take care of" Garrick by paying him more money.

After Garrick said that he would try to pull the cargo, ICE agents observed Gayle leaving the warehouse in a Nissan Pathfinder. A while later, the Pathfinder returned, followed by a box truck. An individual exited the box truck and opened the back of the truck in order to receive cargo. While the two vehicles were parked by the warehouse, marked Customs and Border Protection ("CBP") vehicles and a number of uniformed customs and law-enforcement officers approached the warehouse. The Pathfinder left with haste, and the truck followed quickly, with its back door still open. The CBP agents seized all 120 boxes, which contained approximately 5,000 pounds of cargo, including 3,540 pounds of marijuana. The

marijuana had a total street value of more than $4 million.

After the search, Garrick and Gayle met several more times to discuss other loads of marijuana to be shipped. Gayle told Garrick that he had spoken to another man in Jamaica, "Sean," who would handle the next shipment, and he promised that they would avoid the problems that had occurred the last time. He said that the next shipment would consist of 70 pounds of cargo, with marijuana in only some of the boxes. He told Garrick how many of the boxes needed to be pulled, what markings would identify them, and the name and address of the consignor and consignee of the shipment. He promised that if this test run was successful, he would bring in a 300- to 500-pound load the next time, and Garrick and his contacts would be able to earn more money. When the 70-pound shipment arrived, CBP agents seized it as well, finding approximately 14 pounds of marijuana concealed inside 2 printers.

Gayle was arrested and indicted on 3 counts: (1) conspiracy to import 1,000 kilograms or more of marijuana, in violation of 21 U.S.C. §§ 952(a) and 963; (2) importation of 1,000 kilograms or more of marijuana, in violation of 21 U.S.C. § 952(a) and 18 U.S.C. § 2; and (3) conspiracy to possess with intent to distribute 1,000 kilograms or more of marijuana, in violation of 21 U.S.C. §§ 841(a)(1) and 846. The jury acquitted Gayle of Count 1, but found him guilty of Counts 2 and 3.

5

With respect to Counts 2 and 3, the jury returned a special verdict specifically finding that the offenses involved more than 1,000 kilograms of marijuana.

II.

During jury selection, three potential jurors made statements of concern to the government. First, a man who had spent one year as a police constable in Bermuda indicated that he had helped a number of friends and family members cope with situations of "questionable" treatment by the police. Nevertheless, he felt that he had a balanced understanding of both sides of such a scenario, and he could be fair. Second, a female juror indicated that she had applied for a law enforcement job, but had not yet been accepted. Her brother sold drugs, was shot when someone attempted to steal the drugs, and eventually was arrested. She also felt strongly that deportable aliens were "taking from" the United States and should not be allowed to remain in the country. She said that her job application and her brother's situation would not affect her judgment as a juror, but she did not indicate whether her feelings about deportable aliens would affect her view of testimony offered by such an alien. The third potential juror told the court that he recognized two of the defense witnesses from around his neighborhood. When asked whether he knew them well, he said only that they "say hi to each other," but indicated that he felt positively about them. He first said that his knowledge of

6

them would "probably" bias him as a juror, but when pressed as to whether he could be fair, he said, "I don't know," then, "I could be."

The government initially moved to strike the two male jurors for cause, but the court denied the requests. The government went on to use three of its six peremptory strikes against them and the female juror. Gayle objected that the strikes violated *Batson*, as all three jurors were black. The government stated that the first juror's experience with police harassment rendered him "questionable," and it did not want to take a risk by including him on the jury. It expressed concern about the second juror's feelings toward deportable aliens, as Garrick, its key witness, was deportable. Finally, the government stated that it was striking the third juror because he knew some of the defense witnesses. The court accepted the government's reasons and overruled all three of Gayle's objections.

The Equal Protection Clause prohibits the government from using its peremptory strikes to challenge potential jurors solely on the basis of their race or on the assumption that jurors of a particular race will be unable to consider the case impartially. *Batson v. Kentucky*, 476 U.S. 79, 89, 106 S.Ct. 1712, 1719, 90 L.Ed.2d 69 (1986). We review for clear error a district court's ruling on a *Batson* challenge. *United States v. Blackman*, 66 F.3d 1572, 1575 (11th Cir. 1995).

To establish a *Batson* violation, the defendant must make a *prima facie* case

7

of purposeful discrimination by showing that the government used peremptory challenges to strike a minority juror and that the circumstances raise an inference of discrimination. *Blackman*, 66 F.3d at 1575. If the defendant establishes his *prima facie* case, the burden shifts to the government to demonstrate a race-neutral basis for the strike. *Blackman*, 66 F.3d at 1575. The government's reason need not rise to the level required of a challenge for cause. *Id.* Rather, it "must be an articulable basis which bears some relation to the case before the court." *Id.* The government's reason must be legitimate, clear, and reasonably specific. *Batson*, 476 U.S. at 98 n.20, 106 S.Ct. at 1724 n.20. If the government puts forth such a reason, the trial court must then determine whether the defendant has established purposeful discrimination. *Id.* at 98, 106 S.Ct. at 1724.

Here, Gayle merely noted the race of the three jurors at issue, added with respect to the third juror that having "seen [the witnesses] before" was not an adequate, race-neutral reason, and indicated that several jurors stricken for cause had also been black. Assuming *arguendo* that this was sufficient to make a *prima facie* case of discrimination, the government's expressed concerns about the three jurors were clear, reasonably specific, and race-neutral. *See Batson*, 476 U.S. at 98 n.20, 106 S.Ct. at 1724 n.20; *Blackman*, 66 F.3d at 1575. Gayle's argument on appeal, that none of these concerns rises to the level of justifying a strike for cause,

8

is inapposite, *see Blackman*, 66 F.3d at 1575, and none of the justifications are clearly frivolous or unsupported by the record. The district court did not err in denying Gayle's *Batson* challenges.

III.

Following opening statements, a fourth juror informed the court that she was from Jamaica and was a regular listener of Garrick's one-night-per-week late-night radio show. One of Gayle's attorneys said that he did not "have a problem" with the woman remaining on the jury, and the court and the government agreed. Gayle's other attorney asked whether she knew Garrick personally, and when she said that she did not, the first attorney reiterated, "We're fine. . . . And thank you for telling us." Gayle now argues that the district court erred in permitting her to continue to serve on the jury.

"It is well established in this Circuit that to invite error is to preclude review of that error on appeal." *United States v. Campa*, 529 F.3d 980, 1000 (11th Cir. 2008), *cert. denied*, 129 S.Ct. 2790 (2009). "[A] criminal defendant may not make an affirmative, apparently strategic decision at trial and then complain on appeal that the result of that decision constitutes reversible error." *United States v. Jernigan*, 341 F.3d 1273, 1290 (11th Cir. 2003). As Gayle did not merely fail to object to the court's ruling, but expressly approved the juror's continued service,

9

any error the court might have made was invited by Gayle's affirmative actions. *See Jernigan*, 341 F.3d at 1290. Thus, he has waived appellate review of this issue. *See Campa*, 529 F.3d at 1000.

IV.

Garrick testified as the government's primary witness. In the late 1990s, he was arrested when law-enforcement officers found marijuana in his car, but the charge eventually was dismissed. He had CI agreements with ICE whereby he reported any drug-trafficking activity of which he learned. A few days before Gayle's trial, Garrick admitted to ICE agents that he had been smoking marijuana for the last 10 to 15 years.

Gayle cross-examined Garrick about his reasons for becoming a CI, the immigration and financial benefits he received from the government, the fact that he had possessed and smoked marijuana in violation of his CI agreement, his history of dishonesty with the government regarding his drug use, and his failure to report his CI payments as taxable income. Gayle now argues that it was error to permit Garrick to testify, in light of his habitual drug use and criminal history, and that the district court improperly restricted his impeachment of Garrick.

In the district court, Gayle did not attempt to have Garrick excluded as a witness. Accordingly, the decision to allow Garrick to testify is reviewed for plain

10

error.  *See United States v. Chilcote*, 724 F.2d 1498, 1503 (11th Cir. 1984) (reviewing admission of impeachment evidence).  Thus, Gayle must show (1) an error; (2) that is plain; (3) that affects substantial rights; and (4) that seriously affects the fairness, integrity, or public reputation of judicial proceedings.  *See United States v. Olano*, 507 U.S. 725, 732, 113 S.Ct. 1770, 1776, 123 L.Ed.2d 508 (1993).  The district court's rulings as to the scope and extent of impeachment are reviewed for an abuse of discretion.  *Chilcote*, 724 F.2d at 1503.

Credibility determinations are the exclusive province of the jury.  *United States v. Calderon*, 127 F.3d 1314, 1325 (11th Cir. 1997).  "For testimony of a government witness to be incredible as a matter of law, it must be unbelievable on its face."  *Id.* (quotations omitted).  Thus, it must be testimony as to facts that the witness physically could not have observed or events that could not have occurred under the laws of nature.  *Id.*  The fact that the witness has lied consistently in the past, engaged in criminal activity, or thought that his testimony would benefit him does not make his testimony incredible.  *Id.*  As "the government cannot be expected to depend exclusively upon the virtuous," it may rely upon the testimony of a CI with a history of dishonesty, prior drug use, or other "unsavory" characteristics, so long as a reasonable jury could believe the CI's testimony after hearing relevant impeachment evidence regarding his reliability.  *United States v.*

11

*Richardson*, 764 F.2d 1514, 1521 (11th Cir. 1985).

The Sixth Amendment entitles a defendant only to "an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *United States v. Williams*, 526 F.3d 1312, 1319 (11th Cir. 2008) (quoting *Delaware v. Fensterer*, 474 U.S. 15, 20, 106 S.Ct. 292, 294, 88 L.Ed.2d 15 (1985)). Once cross-examination has been sufficient to satisfy the Confrontation Clause, further questioning is within the court's discretion. *Id.* The test for whether the district court improperly limited cross-examination is "whether a reasonable jury would have received a significantly different impression of the witness'[s] credibility had counsel pursued the proposed line of cross-examination." *Id.* (quoting *United States v. Garcia*, 13 F.3d 1464, 1469 (11th Cir.1994)).

Here, Garrick did not testify to facts that he could not have observed or events that could not have occurred. *See Calderon*, 127 F.3d at 1325. Additionally, after hearing Garrick's testimony, corroborating evidence in the form of the recorded conversations and the officers' surveillance, and the impeachment evidence, a reasonable jury could have found that Garrick testified truthfully. *See Richardson*, 764 F.2d at 1521. Under these circumstances, it is not plain that the government's reliance upon Garrick was unconstitutional, and the district court did

not plainly err when it failed to supplant the jury's fact-finding role and rule

Garrick incredible as a matter of law. *See Calderon*, 127 F.3d at 1325.

As to the scope of impeachment, Gayle cross-examined Garrick extensively.

The court occasionally restricted Gayle from asking questions that were repetitive

or called for speculative answers, but Gayle has not identified any questions he was

prevented from asking that would have significantly altered the jury's impression

of Garrick's credibility. Accordingly, Gayle has not shown that the district court

abused its discretion with respect to the extent and scope of his cross-examination

of Garrick.

V.

Gayle objected to the introduction of transcripts of audiotaped conversations

between him and Garrick. Gayle and Garrick spoke English with the Jamaican

patois, which differs from standard English in many ways, and Gayle argued that

the government's transcripts were not an accurate translation or transcription of the

conversations. Gayle produced his own set of transcripts, but suggested that the

jury should listen to the tapes without the benefit of any transcripts. Because the

parties had not been able to agree on a stipulated set of transcripts and the court

found that the value of the transcripts outweighed the possibility of jury confusion,

it denied Gayle's objection and ruled that each side could introduce its transcripts

during its own case in chief.

The government introduced its transcripts during Garrick's testimony, and the jury read along as the government played the tapes and Garrick described the conversations. Gayle introduced his transcripts through the paralegal transcriptionist who had prepared them. The transcriptionist described in detail the discrepancies between the two sets of transcripts, but the court restricted her from testifying as to the meaning of certain patois words or as to which of the transcripts was more correct.

The district court's evidentiary rulings are reviewed for abuse of discretion. *United States v. Jiminez*, 224 F.3d 1243, 1249 (11th Cir. 2000). District courts have the authority to permit juries to read properly authenticated transcripts while listening to taped conversations. *United States v. Garcia*, 854 F.2d 1280, 1283 (11th Cir. 1988). If the district court and the parties are unable to produce a stipulated or official transcript that satisfies all sides, each side should produce its own version of a transcript or of the disputed portions. *United States v. Wilson*, 578 F.2d 67, 69-70 (5th Cir. 1978). Each side may put on evidence supporting the accuracy of its own version, and the jury must reconcile the discrepancies among the transcripts. *Id.* at 70.

Here, the district court properly permitted each party to produce its own

version of the transcripts for the jury's review. *See id.* at 69-70. The court had the discretion to permit the jury to follow along with the transcripts in evidence as the government played the recordings, and the court explicitly instructed the jury as to the purpose of the transcripts and how to evaluate them. *See Garcia*, 854 F.2d at 1283. Gayle has failed to show error in this regard.

As to the limitation on the transcriptionist's testimony, opinions and inferences by a lay witness are limited to those (1) rationally based on the witness's perceptions; (2) helpful to a clear understanding of her testimony or a determination of a fact in issue; and (3) not based on scientific, technical, or other specialized knowledge that requires expert testimony. *See* Fed.R.Evid. 701. The correctness of a translation is a question of fact for the jury, and the district court does not abuse its discretion by requiring an alternate translation to be properly authenticated by an interpreter. *See United States v. Llinas*, 603 F.2d 506, 509-10 (5th Cir. 1979).

The transcriptionist did not speak the Jamaican patois, and she had no familiarity with it beyond having referred to an online dictionary while preparing the transcripts. The district court did not abuse its discretion in finding that she was unqualified to offer an opinion on how certain words should be translated, and that she could not usurp the jury's function by opining as to which of the two

15

transcripts was more accurate. *See* Fed.R.Evid. 701; *Llinas*, 603 F.2d at 509-10; *Wilson*, 578 F.2d at 70.

VI.

We review a challenge to the sufficiency of the evidence *de novo*, viewing the evidence in the light most favorable to the government. *United States v. Toler*, 144 F.3d 1423, 1428 (11th Cir. 1998). All reasonable inferences and credibility determinations are drawn in favor of the government. *United States v. Ellisor*, 522 F.3d 1255, 1271 (11th Cir. 2008). We will affirm a guilty verdict unless no reasonable trier of fact could have found guilt beyond a reasonable doubt. *Toler*, 144 F.3d at 1428.

In order to sustain a conviction for importation of a controlled substance, the government must show that the defendant (1) knowingly imported into the United States (2) from any place outside the United States (3) any controlled substance or narcotic. 21 U.S.C. § 952(a); *see United States v. Lewis*, 676 F.2d 508, 512 (11th Cir. 1982) (holding that the defendant must know that he is importing a controlled substance, but need not know the particular drug involved). If a government agent assisted or accomplished the importation, the defendant still may be found guilty as an aider and abettor if, for example, the defendant used the agent to transport a controlled substance in which the defendant had a proprietary interest. *United*

16

*States v. Delgado*, 56 F.3d 1357, 1366-67 (11th Cir. 1995).

The elements of a conspiracy offense, 21 U.S.C. § 846, are: "(1) an agreement between the defendant and one or more persons, (2) the object of which is to do either an unlawful act or a lawful act by unlawful means." *Toler*, 144 F.3d at 1426. Here, Gayle was charged with conspiring to possess 1,000 kilograms or more of marijuana with intent to distribute, in violation of 21 U.S.C. § 841. Thus, in order to convict him, the government was required to prove (1) an agreement between Gayle and 1 or more persons (2) to possess and distribute 1,000 kilograms or more of marijuana. *See id.*; *United States v. Poole*, 878 F.2d 1389, 1391 (11th Cir. 1989) (stating that § 841 has three elements: knowledge, possession, and intent to distribute).

Because a conspiracy is predominantly a mental crime, circumstantial evidence frequently is necessary to prove its existence. *Toler*, 144 F.3d at 1426. "The government may prove . . . an agreement . . . through inferences from the conduct of the alleged participants or from circumstantial evidence of a scheme." *United States v. Obregon*, 893 F.2d 1307, 1311 (11th Cir. 1990) (quotations and citations omitted). Intent to distribute can be proved circumstantially through the quantity of cocaine, the existence of related implements such as scales, or other evidence. *Poole*, 878 F.2d at 1392.

As noted above, the government presented evidence that Gayle and at least two other individuals in Jamaica arranged to bring marijuana into the United States by loading it into a plane's cargo hold and enlisting Garrick to offload it for them. Gayle offered to pay Garrick, as well as the fictional colleague who purportedly was going to assist Garrick, and he said that more such opportunities would be available if the shipments went well. He said that the packages would contain marijuana, and he accurately described the number of boxes, the names and addresses of the consignors and consignees, and, for the small shipment, how to identify the boxes containing the marijuana. He arranged for a truck and driver, which followed Gayle's Pathfinder to the warehouse on November 30th. When Garrick expressed surprise at the size of the first load, Gayle begged him to offload it and promised to pay him extra. Under these facts, the jury reasonably could have found that Gayle knowingly and actively arranged and executed the importation of the marijuana, of which he planned to take possession. Therefore, the jury's verdict on the importation charge was reasonable. *See Ellisor*, 522 F.3d at 1271.

As to the conspiracy-to-possess charge, the government presented evidence that Gayle spoke to Sean, Peter, and others in Jamaica on multiple occasions, in order to plan and execute the shipment of the marijuana. He also made

18

arrangements with the box-truck driver to pick up the cargo. Based on the truck driver's rapid departure upon the arrival of the CBP officers, the jury reasonably could infer that the driver knew that the boxes contained marijuana. Furthermore, the jury reasonably could infer from the size of the shipment that the marijuana was intended for distribution, rather than personal use. *See Poole*, 878 F.2d at 1392. Therefore, the jury reasonably concluded that Gayle was part of a conspiracy to possess and distribute marijuana. *See Ellisor*, 522 F.3d at 1271; *Toler*, 144 F.3d at 1426.

Finally, the first shipment contained approximately 3,540 pounds, or 1,606 kilograms, of marijuana. Gayle had told Garrick that the load would weigh only 500 pounds, but he correctly informed Garrick that the shipment would be divided among 120 boxes, and he arranged for a truck and pallets that would hold much more than 500 pounds. When Garrick expressed surprise that the load consisted of 5,000 pounds of manifested cargo, Gayle first said, "That's what I told you," and asked what had happened to "Julio," Garrick's fictional assistant. Gayle then repeatedly begged him to pull the entire load, encouraging him to do so by promising him more money. Viewing the evidence in the light most favorable to the government, the jury reasonably found that Gayle knew that he was importing more than 1,000 kilograms of marijuana, and that the full amount of the load was

the object of the marijuana-distribution conspiracy. *Toler*, 144 F.3d at 1428.

Accordingly, the evidence was sufficient to support Gayle's convictions and the

special drug-quantity verdict.

VII.

Gayle argues on appeal that the government improperly commented on his

failure to testify, when it said in opening statements that the jury would hear from

Gayle in the form of "testimony in the recorded conversations," and when it argued

in closing that Garrick's description of the conversations was uncontroverted.

Gayle further asserts that cumulative error arose from the district court:

(1) commenting that the Front Royal training facility, where a CBP K-9 officer had

trained, was a "fabulous operation," and thanking her for coming to court;

(2) expressing sympathy for an ICE agent that he had to return home to Newark,

New Jersey; (3) noting that another CBP officer was "a Miami guy";

(4) incorrectly stating that the paralegal transcriptionist was defense counsel's

employee; (5) commenting that counsel's cross-examination of the ICE officer

included "lots of oratory" and saying "Whoa.  Whoa.  Whoa" during one question

posed to him; (6) responding to a suggestion of an afternoon recess with, "Boy,

I'm all for that"; (7) telling the private investigator who had testified for Gayle,

"You can go back to investigating, as long as it's not me"; (8) admonishing

20

counsel during closing arguments, "You know better.  Don't do this"; and (9) confusing the jury by saying, "Now, that was a conspiracy," when the courtroom lights blinked during the jury instructions.

As Gayle did not object in the district court to the prosecutor's comments in opening and closing statements, or to any of the enumerated comments by the district court, they are reviewed individually for plain error only.  *See Chilcote*, 724 F.2d at 1503.  Again, this requires Gayle to show (1) an error; (2) that is plain; (3) that affects substantial rights; and (4) that seriously affects the fairness, integrity, or public reputation of judicial proceedings.  *See Olano*, 507 U.S. at 732, 113 S.Ct. at 1776.

The Fifth Amendment forbids a prosecutor from commenting on a defendant's failure to testify.  *United States v. Knowles*, 66 F.3d 1146, 1162 (11th Cir. 1995).  A prosecutor's comment violates the Fifth Amendment if it either (1) was manifestly intended to be a comment on the defendant's failure to testify, or (2) was of such a character that a jury would naturally and necessarily take it to be a comment on the defendant's failure to testify.  *Id.* at 1162-63.  "The question is not whether the jury possibly or even probably would view the remark in this manner, but whether [it] necessarily would have done so."  *Id.* at 1163 (quotation omitted).  The statement must be examined in context, in order to evaluate the

21

prosecutor's motive and discern the statement's impact. *Id.* A comment that the government's evidence was unrebutted or that the defendant had not put on a defense does not violate the defendant's right not to testify. *United States v. Downs*, 615 F.2d 677, 679 (5th Cir. 1980). In opening statements, the prosecutor may characterize the evidence to be adduced at trial, and part of the jury's role will be to evaluate the accuracy of that characterization. *See United States v. Correa-Arroyave*, 721 F.2d 792, 795 (11th Cir. 1983).

A defendant is denied a constitutionally fair trial if the judge's conduct strays from neutrality, and the court abuses its authority when it abandons its role and assumes that of an advocate. *United States v. Wright*, 392 F.3d 1269, 1274 (11th Cir. 2004). Yet the "judge is not relegated to complete silence and inaction during the course of [a] criminal jury trial." *Id.* (quotation omitted). He properly may comment on the evidence, question witnesses, elicit facts not yet adduced or clarify those presented, and maintain the pace of the trial by exercising his discretion to interrupt or cut off counsel. *Id.* at 1274-75.

Under the cumulative-error doctrine, an aggregation of otherwise non-reversible errors may combine to yield an overall denial of the constitutional right to a fair trial, thus calling for reversal. *United States v. Baker*, 432 F.3d 1189, 1223 (11th Cir. 2005). The record is reviewed *de novo*, even when the individual

22

errors are reviewed only for plain error. *United States v. Dohan*, 508 F.3d 989, 993 (11th Cir. 2007); *Baker*, 432 F.3d at 1224.

As to the prosecution's opening statement, the description of Gayle's own statements on the tapes as "testimony in the recorded conversations" merely characterized the evidence that would be adduced at trial, *see Correa-Arroyave*, 721 F.2d at 795, without suggesting or assuming whether Gayle would take the stand. The comment during closing argument that no witness had challenged Garrick's description of the conversations was not manifestly a comment on Gayle's failure to testify, and it would not necessarily have been taken as such, as it could also have been construed as a comment about the shortcomings of the defense witnesses' testimony. *See Knowles*, 66 F.3d at 1162-63; *Downs*, 615 F.2d at 679. In context, these comments do not rise to the level of plain error.

As to the district court's comments, it merely engaged in small talk with the ICE agent and the investigator, and its reference to the CBP agent as "a Miami guy" was simply an off-hand comment as the court looked for him on the witness list. There is no indication in the record that the court made this comment either approvingly or disapprovingly, or that the jury otherwise would not have been told where the agent worked. When the transcriptionist was asked whether she was defense counsel's employee and she responded by saying that she did contract

23

work for him, the court's interjection to "score that as a yes" was merely an attempt to clarify her testimony, and the transcriptionist promptly explained the nature of her contract more fully. Nothing in the record suggests that the court was making a derogatory comment when it said that it was "all for" taking an afternoon break while counsel resolved some confusion over the transcripts.

The court properly exercised its discretion to cut off counsel's objectionable questioning and argument, and to caution him indirectly about crossing a line between leading questions and "oratory." The court's statement, "Now that was a conspiracy," was clearly a joke in response to the courtroom lights blinking unexpectedly. Furthermore, it came at the end of the instruction about the substantive importation charge, not one of the conspiracy charges, and the jury acquitted Gayle of conspiracy to import, so there is nothing in the record to suggest that the jury misconstrued the joke as a serious definition of Gayle's alleged conduct.

As to the court's remark that the Front Royal training facility, where the K-9 agent and her dog had trained, was a "fabulous operation," the court later read a curative instruction specifying that the jury should not consider any comments it might have made about the evidence. In light of all of the other evidence, the very limited scope of the K-9 agent's testimony, and the court's instruction, Gayle has

24

not shown that this comment affected his substantial rights. *See Olano*, 507 U.S. at 732, 113 S.Ct. at 1776. Finally, as only this comment was even arguably erroneous, Gayle has not shown cumulative error from the district court's comments as a whole. *See Baker*, 432 F.3d at 1223.

## VIII.

The government proposed jury instructions for the conspiracy charges that would require a finding that Gayle "knowingly and intentionally" joined the unlawful plan. Gayle proposed instructions that described "willfully" joining the plan with knowledge of its unlawful purpose. The government explained that a panel of this Court had recently held "intentionally" to be the correct term, and the indictment had used the word "intentionally." The court accepted the government's explanation and indicated that it would use "intentionally" in the instruction. Gayle's counsel added, "As much as I would like to argue that the Court should go with the pattern, [the prosecutor's] statement on the law is correct." Defense counsel later stated that he had "[n]o problems" with the jury instructions.

Again, a criminal defendant who affirmatively invites error at trial is precluded from seeking appellate review of that purported error. *See Campa*, 529 F.3d at 1000; *Jernigan*, 341 F.3d at 1290. When counsel affirmatively asserted his

25

agreement with the government's interpretation of the law, he invited any error the court might have made with respect to the conspiracy instructions. *See Jernigan*, 341 F.3d at 1290. Thus, he has waived appellate review of this issue. *See Campa*, 529 F.3d at 1000.

IX.

Between trial and sentencing, Gayle filed a *pro se* Florida Bar complaint against the prosecutor, alleging that several evidentiary disputes at trial were evidence of her unethical behavior. At the sentencing hearing, counsel moved to disqualify the prosecutor, asserting that an appearance of impropriety arose from the prosecutor's continued involvement in the case while the bar complaint was pending. The court denied the motion, finding that (1) the Florida Bar would not have jurisdiction over the complaint, as the prosecutor was not licensed in Florida, and (2) the likelihood of a federal authority taking action on the complaint was unlikely, especially in light of the issues raised. During the course of the sentencing hearing, the government moved for the first time for a two- to four-point role enhancement to Gayle's offense level. The court denied the motion.

We review for clear error the district court's findings of fact on a motion to disqualify, "while carefully examining the district court's interpretation and

26

application of relevant ethical standards." *Norton v. Tallahassee Mem'l Hosp.*, 689 F.2d 938, 941 (11th Cir. 1982) (addressing a motion to disqualify in a civil case). In order to disqualify an attorney on the basis of an appearance of impropriety, the movant need not prove actual wrongdoing, but must prove that (1) there exists a reasonable possibility that some specifically identifiable impropriety did, in fact, occur, and (2) the likelihood of public suspicion or obloquy outweighs the social interests that will be served by the attorney's continued participation in the case. *Id.*

The jurisprudence regarding prosecutorial vindictiveness is based on the principle that a defendant "may not be punished for exercising a protected statutory or constitutional right." *United States v. Goodwin*, 457 U.S. 368, 372, 102 S.Ct. 2485, 2488, 73 L.Ed.2d 74 (1982). A rebuttable presumption of vindictiveness arises where the government takes unilateral action, such as obtaining a superseding indictment on additional or more serious charges, in a context that indicates a reasonable likelihood of vindictiveness as a response to the defendant's exercise of his rights. *See id.* at 372-77, 102 S.Ct. at 2488-90. Where the facts do not give rise to a presumption of vindictiveness, the defendant must show actual vindictiveness by proving that the government's action was taken solely to penalize the defendant. *See id.* at 380-81, 380 n.12; 102 S.Ct. at 2492 & n.12.

27

Here, Gayle's motion to disqualify the prosecutor did not accuse her of engaging in unethical conduct, but, rather, expressed concern about an appearance of impropriety.  The district court did not clearly err in finding that the prosecutor would not be subject to discipline by the Florida Bar, the complaint merely reargued several evidentiary rulings from the trial, and the possibility of a federal review of Gayle's complaint was too attenuated to be of concern.  Under the circumstances, the district court did not err in concluding that Gayle had failed to show a likelihood of public suspicion or obloquy that would justify replacing the prosecutor and delaying the sentencing proceedings, and, thus, that he had failed to establish an appearance of impropriety warranting disqualification.  *See Norton*, 689 F.2d at 941.

Furthermore, to the extent that Gayle alleges prosecutorial vindictiveness underlying the role-enhancement request, he has failed to prove his claim.  He cites no case law suggesting that the ability to file a bar complaint against a prosecutor is a "protected statutory or constitutional right" of the sort implicated in prosecutorial-vindictiveness cases, and a prosecutor does not take unilateral action against the defendant, punitively or otherwise, when she merely argues that the district court should apply an offense-level enhancement based on the facts of the case.  *See Goodwin*, 457 U.S. at 372, 102 S.Ct. at 2488.  Indeed, in this case, the

prosecutor's request ultimately did not penalize Gayle at all, as the court denied the role enhancement. Thus, Gayle has not shown facts supporting either a presumption of vindictiveness or actual vindictiveness. *See id.* at 372-77, 380 n.12; 102 S.Ct. at 2488, 2492 n.12.

## X.

Gayle argued at sentencing that he should be held responsible for only 265.5 kilograms, or 585 pounds, of marijuana. He contended that the preponderance of the evidence failed to support the position that he reasonably could have foreseen that the larger shipment would contain more than 3,500 pounds of marijuana, and, thus, the court should disregard the jury's special verdict as to the drug quantity. The court overruled his objection and adhered to the jury's drug-quantity verdict.

We review a sentence for reasonableness, in part, by "ensur[ing] that the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range." *Gall v. United States*, 552 U.S. 38, 51, 128 S.Ct. 586, 597, 169 L.Ed.2d 445 (2007). A district court's findings of fact as to the applicability of guideline enhancements are reviewed for clear error. *See United States v. Yates*, 990 F.2d 1179, 1182 (11th Cir. 1993).

The government must prove the applicability of an enhancement by a preponderance of the evidence. *See id.* "The findings of fact of the sentencing

29

court may be based on evidence heard during trial, facts admitted by a defendant's plea of guilty, undisputed statements in the presentence report, or evidence presented at the sentencing hearing." *United States v. Saunders*, 318 F.3d 1257, 1271 n.22 (11th Cir. 2003) (quotations and alteration omitted). The use of special verdicts is appropriate for addressing sentencing matters such as the quantity of drugs involved in an offense. *United States v. Clay*, 355 F.3d 1281, 1285 (11th Cir. 2004).

The jury specifically found that both Counts 2 and 3 involved more than 1,000 kilograms (2,204 pounds) of marijuana. Thus, the jury found not only that Gayle was a member of a conspiracy to possess more than 1,000 kilograms of marijuana, but that he, individually, had imported more than 1,000 kilograms of the drug. The district court did not clearly err in relying on the jury's special verdict. *See Clay*, 355 F.3d at 1285. Thus, regardless of whether Gayle reasonably could have foreseen the full amount underlying the conspiracy charge, he still would be accountable for more than 1,000 kilograms due to the importation charge. *See* U.S.S.G. § 3D1.3(b) (stating that the offense level for grouped drug-quantity-based offenses is determined by the aggregated quantity or the highest offense level). Accordingly, the district court did not clearly err in determining his offense level.

For the foregoing reasons, we affirm Gayle's convictions and sentences.

**AFFIRMED.**