# IMPORTANT NOTICE
## NOT TO BE PUBLISHED OPINION

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED." PURSUANT TO THE RULES OF CIVIL PROCEDURE PROMULGATED BY THE SUPREME COURT, RAP 40(D), THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE CITED OR USED AS BINDING PRECEDENT IN ANY OTHER CASE IN ANY COURT OF THIS STATE; HOWEVER, UNPUBLISHED KENTUCKY APPELLATE DECISIONS, RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE BEFORE THE COURT. OPINIONS CITED FOR CONSIDERATION BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED DECISION IN THE FILED DOCUMENT AND A COPY OF THE ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE DOCUMENT TO THE COURT AND ALL PARTIES TO THE ACTION.

RENDERED: OCTOBER 23, 2025
NOT TO BE PUBLISHED

# Supreme Court of Kentucky

2023-SC-0253-MR

ISABEL TZUNUX-ZACARIAS            APPELLANT

V.            ON APPEAL FROM HARDIN CIRCUIT COURT
HONORABLE LARRY ASHLOCK, JUDGE
NO. 21-CR-00020

COMMONWEALTH OF KENTUCKY            APPELLEE

AND

2023-SC-0254-MR

MARIO TZUNUX-ZACARIAS            APPELLANT

V.            ON APPEAL FROM HARDIN CIRCUIT COURT
HONORABLE LARRY ASHLOCK, JUDGE
NO. 21-CR-00277

COMMONWEALTH OF KENTUCKY            APPELLEE

## MEMORANDUM OPINION OF THE COURT

### AFFIRMING

The Hardin Circuit Court held a multi-day joint trial of Appellants Isabel Tzunux-Zacarias and Mario Tzunux-Zacarias on charges of first-degree rape, first-degree sodomy, kidnapping, and first-degree burglary. The jury found

both Isabel and Mario guilty of complicity to rape, complicity to burglary, and complicity to kidnapping. The jury acquitted both on the sodomy charges.

The jury recommended a total sentence of thirty years for both Isabel and Mario, and the trial court sentenced in conformity with that recommendation. Isabel and Mario now appeal to this Court as a matter of right. KY. CONST. § 110(2)(b). After careful review, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Appellants Isabel Tzunux-Zacarias and Mario Tzunux-Zacarias are brothers who immigrated to the United States from Guatemala in 2017. They were raised speaking a native language of Guatemala and Spanish, and began learning English upon coming to the United States.

On November 25, 2020, surveillance video showed Isabel's vehicle pull up and park at M.C.'s apartment around 7 a.m.[1] Isabel and Mario found M.C.'s door unlocked and entered her home. They proceeded to locate M.C. and duct tape her hands, mouth, and eyes. Duct tape with long, black hair attached was located both at the scene and in Isabel's vehicle. Each admitted to holding M.C. down and each admitted to having sex with her, though Mario stated he did not ejaculate. The attack lasted approximately thirty minutes, after which Isabel and Mario duct taped M.C.'s legs before fleeing the scene.

Gabriel, a neighbor of M.C.'s, found M.C. in her apartment several hours later and called 911. M.C. was taken to a local hospital and examined by Amy Bashaw, a sexual assault nurse examiner ("SANE"). Bashaw documented

---

[1] We use initials to protect the victim's privacy.

M.C.'s injuries as including vaginal and anal lacerations and abrasions on her face consistent with having been bound with duct tape. Bashaw also obtained a rape kit which was tested for DNA. The results showed the presence of DNA from Isabel and a second unknown male, but not from Mario.

Isabel and Mario were each eventually indicted on charges of first-degree rape, first-degree sodomy, kidnapping, and first-degree burglary. The Hardin Circuit Court held a joint trial.[2] The Commonwealth could not locate M.C. and she therefore did not testify at trial. Gabriel also did not testify, nor did Isabel or Mario testify.

The lead detective, Detective Burris of the Elizabethtown Police Department, was the Commonwealth's primary witness at trial. Detective Burris testified to statements made by Isabel and Mario to law enforcement after the attack, including Isabel's statement that M.C. had not consented to sex on the day of the attack.

SANE Nurse Bashaw testified at trial that M.C. was quiet, reserved, and tearful during the SANE examination. Her urine had an abnormal red color from the presence of blood, the likely causes of which could be kidney stones, a urinary tract infection ("UTI"), or non-consensual sex. However, M.C. had no other indications of kidney stones or a UTI. Bashaw testified that M.C. had abrasion injuries around both eyes, as well as a skin tear near her left eye. She also had abrasions and contusions on both forearms, her left wrist, the top of her right hand, and her right ear. Bashaw further testified that M.C. also

---

[2] Mario was transferred as a youthful offender to the Circuit Court.

3

had vaginal and anal lacerations and abrasions.  Bashaw also testified that it was possible for vaginal and anal injuries such as those suffered by M.C. to result from consensual sex, though it was not probable.

The jury convicted Isabel and Mario on the charges of rape, burglary, and kidnapping, and acquitted on the sodomy charge.  The jury recommended a sentence of thirty years each, which the trial court imposed.  Isabel and Mario now appeal to this Court as a matter of right.[3]

**ANALYSIS**

Isabel and Mario raise nine issues for our review.  Together, they raise the following seven issues:  (1) whether the admission of the other's statements to law enforcement violated the Confrontation Clause; (2) whether a testimonial summary of those statements by the lead detective violated the rule of completeness, was an improper interpretation of evidence, and was misleading; (3) whether the admission of translations without testimony by the translator violated the hearsay rules, the Confrontation Clause, and our holding in *Lopez v. Commonwealth*, 459 S.W.3d 867 (Ky. 2015); (4) whether the trial court erred in excluding evidence of the victim's alleged prior consensual sexual relations with the Appellants; (5) whether the trial court erred in admitting a post-attack text message in which Mario threatened the victim; (6) whether the trial court erred in failing to strike a juror who had a friend and a daughter who had experienced sexual assault; and (7) whether the trial court erred in failing to

---

[3] Isabel and Mario each filed a separate appeal to this Court.  We address both appeals in this single Opinion given that each involves the same underlying facts and each raises similar issues.

4

suppress the Appellants' statements to law enforcement. Mario also separately raises two additional issues: (1) whether the trial court erred in allowing the SANE nurse to testify as to the probability that the victim's injuries occurred as a result of consensual sex; and (2) whether the trial court erred in denying Mario's motion for a directed verdict. We review each issue in turn, providing additional facts as necessary.

## I.  Preservation Issues

Before proceeding to the merits, one preliminary matter we must address are difficulties arising from the incomprehensibility of portions of the trial court record. For reasons that are unclear, a significant portion of the bench conferences held during trial are inaudible due to a high amount of static background noise. Faced with this record deficiency, Isabel and Mario filed a proposed narrative statement with the trial court summarizing relevant portions of the inaudible proceedings. The Commonwealth filed a response that largely did not take issue with the substance of the Appellants' proposed narrative statement, but rather more generally urged that the statement should be used to supplement the original record, rather than in lieu of that record.

Our Rules of Appellate Procedure provide for the use of a narrative statement when a record of the trial court proceedings was not made or is not clearly understandable. Rules of Appellate Procedure ("RAP") 25(A)(1). To employ this mechanism, the parties are to submit proposed narrative statements summarizing such proceedings to the trial court for settlement and approval. The statements, "as settled and approved, shall be included in the

5

record on appeal." RAP 25(A)(2). The approved statement may be used "as a supplement to or in lieu of an insufficient official record." RAP 25(A)(1).

The Commonwealth contends that here, the trial court failed to settle and approve the proposed narrative statement for use in our consideration of these appeals. We disagree. To the contrary, the trial court entered an Order approving both the Defendants' Narrative Statement and the Commonwealth's response, and further directing that "the statements adopted by the Court are to be used to supplement the official record and not in lieu of the official record." As such, the narrative statement and response were duly settled and approved by the trial court and may be considered as part of the record. We further note that although the original bench conference recordings are in some instances difficult to comprehend, the record is otherwise understandable. As such, the settled and approved Narrative Statement is properly used to supplement the original recording, rather than in lieu of it. Thus, we will turn to the Narrative Statement only when we are unable to understand the original trial court record.

Isabel and Mario urge that in instances where the record remains unclear even after consideration of the approved Narrative Statements, we should construe the record in their favor. In contrast, the Commonwealth argues that in such circumstances, we must construe the record as supporting the trial court's decision. We conclude the Commonwealth's position is correct. Indeed, we have expressly held that "when the complete record is not before the appellate court, that court must assume that the omitted record supports the

decision of the trial court." *Commonwealth v. Thompson*, 697 S.W.2d 143, 145 (Ky. 1985); *see also King v. Commonwealth*, 384 S.W.3d 193, 194 (Ky. App. 2012) ("If evidence is missing from the record, we must assume that the trial court's decision is supported by the record."). Thus, where a settled and approved narrative statement is insufficient to cure an incomprehensible original recording, we must assume the record supports the trial court's decision.

Thus, here, because we have an original recording that is in some limited instances difficult to understand, and because we also have a settled and approved Narrative Statement regarding those portions of the proceedings, we will rely upon the original record when it is understandable. If the original record is incomprehensible, we will turn to the Narrative Statement as a supplement to the original record. Finally, if the Narrative Statement fails to provide an adequate understanding, we will assume the record supports the trial court's decision.

## II. Admission Of The Co-Defendants' Statements Without A Limiting Instruction Was Error, But Harmless.

Isabel and Mario each argue that the trial court violated their Confrontation Clause rights when it allowed Detective Burris to testify regarding what the other said to law enforcement. Given the possibility the defendants would not testify at trial and therefore could not be cross-examined about those statements, Isabel moved before trial to exclude those statements. Isabel contended that to comply with *Bruton v. United States*, 391 U.S. 123 (1968), the statements would have to be redacted so extensively as to leave

7

almost nothing remaining.  Isabel further moved that if the statements were to be admitted, the trial court should do so only after an extensive *in camera* review and with a limiting instruction directing the jury not to consider each statement against the other co-defendant.

Before trial, Mario also filed a motion seeking redactions of Isabel's statement and also referencing the requirement that a limiting instruction be provided.  At trial, Mario also joined Isabel's motion.  Ultimately, the trial court ruled that the statements could be admitted in redacted form or, in the alternative, Detective Burris could testify to the contents of each statement. The trial court further directed that the statements be admitted in compliance with *Bruton's* requirements.  The trial court did not rule on the request for a limiting instruction and did not provide such an instruction at trial.[4]  Given that Isabel and Mario each objected to introduction of the other's statement for specifically articulated reasons and that each requested a limiting instruction, their allegations of error regarding admission of those statements and the lack of a limiting instruction are preserved.  Rule of Criminal Procedure ("RCr") 9.22 ("[I]t is sufficient that a party, at the time the ruling or order of the court is made or sought, makes known to the court the action which that party desires the court to take or any objection to the action of the court, and on request of the court, the grounds therefor[.]"); Kentucky Rule of Evidence ("KRE") 103(a)(1)

---

[4] It appears the trial court's failure to provide a limiting instruction may be due to the fact that Judge Easton, who was sitting when the pre-trial motion requesting such an instruction was heard, left office before trial.  Thus a different judge, Judge Ashlock, presided over the trial.

(providing that error may be raised regarding the admission of evidence if "a timely objection or motion to strike appears of record, stating the specific ground of the objection, if the specific ground was not apparent from the context[.]").

At trial, to comply with *Bruton*, Detective Burris testified to statements made by Mario during his interview with law enforcement. Detective Burris testified that Mario at first denied having sex with M.C., but later admitted he did have sex with her after referencing going to jail, being sad, and being scared to tell Detective Burris what he had done. Detective Burris also testified that Mario stated he had done a "bad thing," that he had entered M.C.'s apartment through an unlocked glass door, that he grabbed M.C. and held her down, that he did not ejaculate, and that duct tape was present at the incident.

A portion of Isabel's interview with law enforcement was played for the jury in which Isabel stated that he brought the duct tape to M.C.'s apartment from his car. Detective Burris testified regarding the remainder of Isabel's interview. He testified that Isabel stated he went and saw M.C. on the day of the crime, planned to use a card to enter her residence but did not need to because the sliding glass door was unlocked, and that when he entered M.C. asked who was there. Detective Burris further testified that Isabel stated he went upstairs, held M.C. down, used duct tape on her hands, eyes, and face, had sex with her, and then duct taped her legs.

Mario and Isabel each argue that their Confrontation Clause rights were violated by the admission of the other's statement to law enforcement. The

9

Confrontation Clause, set forth in the Sixth Amendment to the U.S. Constitution, provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to . . . be confronted with the witnesses against him[.]" Section 11 of the Kentucky Constitution similarly provides that "[i]n all criminal prosecutions the accused has the right . . . to meet the witnesses face to face[.]"

The U.S. Supreme Court has construed the term "witness" as used in the Confrontation Clause to mean "those who 'bear testimony.'" *Crawford v. Washington*, 541 U.S. 36, 51 (2004) (quoting 2 N. Webster, An American Dictionary of the English Language (1828)). It has construed "testimony," in turn, to mean "[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact." *Id.* Finally, it has held that the Confrontation Clause permits out-of-court testimony to be offered against a criminal defendant only if the maker of the statement is unavailable and the defendant has had a prior opportunity for cross-examination. *Id.* at 68 ("Where testimonial evidence is at issue, . . . the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination.").

A prosecutor's efforts in a multi-defendant trial to admit a defendant's out-of-court statements to law enforcement present unique challenges for application of the Confrontation Clause. Such statements are of course generally admissible against the defendant who made the statement. *See, e.g.,* KRE 801A(b)(1) ("A statement is not excluded by the hearsay rule, even though the declarant is available as a witness, if the statement is offered against a

10

party and is the party's own statement.") (cleaned up). However, as to a co-defendant who did not make the statement, such statements are also a paradigmatic example of out-of-court "testimony" generally barred by the Confrontation Clause absent unavailability of the witness and a prior opportunity for cross-examination. *Crawford*, 541 U.S. at 52 ("Statements taken by police officers in the course of interrogations are also testimonial under even a narrow standard."). And while a criminal defendant's invocation of his Fifth Amendment right to remain silent renders him unavailable as a witness, it also forecloses any opportunity for his co-defendant to cross-examine him regarding his out-of-court statement to law enforcement. Thus, while the defendant's out-of-court statement to law enforcement would be admissible against the defendant himself, the Confrontation Clause would bar its admission against his co-defendant given the lack of an opportunity for the co-defendant to cross-examine the defendant regarding the statement.

The U.S. Supreme Court has had several occasions to consider this conflict between the admissibility of a non-testifying criminal defendant's statement against himself and its inadmissibility against his co-defendant. In *Bruton*, the Court held that a limiting instruction directing a jury to disregard portions of the statement inculpating the co-defendant is insufficient to satisfy the Confrontation Clause, and thus a non-testifying defendant's testimonial out-of-court statements that facially incriminate a co-defendant are inadmissible at trial. 391 U.S. at 137. The Court later explained this prohibition applies not only to statements that directly name the co-defendant,

11

but also to statements whose redactions nonetheless leave the statement directly accusatory against the co-defendant. *Gray v. Maryland*, 523 U.S. 185, 194 (1998). Finally, the U.S. Supreme Court recently added that the admission of portions of a defendant's statement that do *not* directly inculpate the co-defendant is permissible under the Confrontation Clause, provided a limiting instruction is given to the jury directing it not to consider the statement against the co-defendant. *Samia v. United States*, 599 U.S. 635, 655 (2023).

Here, none of the statements by Mario or Isabel as testified to by Detective Burris were directly accusatory of the other. To the contrary, Detective Burris' summary of Mario's statement included only Mario's assertions about his own conduct, and Detective Burris' summary of Isabel's statement included only Isabel's assertions about his own conduct. Thus, admission of those statements at trial did not, in and of itself, violate the Confrontation Clause. *See Quisenberry v. Commonwealth*, 336 S.W.3d 19, 27-28 (Ky. 2011) (finding no Confrontation Clause violation in admission of one defendant's statement in two-defendant trial because "[u]nlike the confessions held inadmissible in *Bruton* and *Gray*, [the defendant's] statement did not expressly or in any way directly refer to [his co-defendant]. It was clearly focused, rather, [on defendant's] own role in the events at issue.")

However, we have held that even where a defendant's testimonial out-of-court statement does not directly incriminate his co-defendant, the trial court nonetheless must, upon request, provide a limiting instruction to the jury

12

directing that the statement be used only against the defendant who made it.[5]

*Id.* at 29 ("[W]e reiterate that when a properly redacted statement of a codefendant is to be presented to the jury, a limiting instruction *should always be given upon the defendant's request.*") (emphasis added); *see also Richardson v. Marsh*, 481 U.S. 200, 211 (1987) ("[T]he Confrontation Clause is not violated by the admission of a nontestifying codefendant's confession *with a proper limiting instruction* when, as here, the confession is redacted to eliminate not only the defendant's name, but any reference to his or her existence.") (emphasis added). One reason to require a limiting instruction even where the statement is redacted so as to eliminate all reference to the co-defendant is that such a statement nonetheless "is detrimental to a codefendant to the extent the confessor denies responsibility for criminal conduct because a jury may be inclined to shift that responsibility to the other person(s) on trial." *Quisenberry*, 336 S.W.3d at 28. Thus here, because Mario and Isabel each requested a limiting instruction regarding the admission of the other's statement to law enforcement, the trial court erred (even if only as a result of a different judge holding trial) in failing to give such an instruction.

---

[5] We have held that reversal is not required for failure to provide a limiting instruction in circumstances where the defendant has *not* requested such an instruction, given that such a decision may be a matter of trial strategy. *Caudill v. Commonwealth*, 120 S.W.3d 635, 659 (Ky. 2003) ("If the non-testifying codefendant's out-of-court statement is so redacted that it does not inculpate the defendant in the commission of the crime, the limiting instruction might well be viewed as calling the jury's attention to the very fact that the redaction was intended to suppress, *i.e.*, that the deleted portions of the codefendant's confession would have implicated the defendant in the commission of the crime . . . . [W]e view this as a matter of trial strategy and decline to treat as automatic reversible error the failure to give an unrequested limiting admonition.").

13

However, as with other preserved errors of a constitutional dimension, a trial court's failure to provide a requested limiting instruction in such circumstances does not require reversal if the error was harmless beyond a reasonable doubt. *See Staples v. Commonwealth*, 454 S.W.3d 803, 826-27 (Ky. 2014). Thus, we consider "the improper evidence in the context of the entire trial" and ask "whether there is a 'reasonable possibility that the evidence complained of might have contributed to the conviction.'" *Id.* (quoting *Talbott v. Commonwealth*, 968 S.W.2d 76, 84 (Ky. 1998)).

Here, in considering each statement in the context of the entire evidence presented at trial, we conclude the trial court's failure to provide the requested limiting instruction resulted only in harmless error. The trial court granted the request for the statements to comport with *Bruton*'s requirements, and Detective Burris' testimonial summary of each defendant's statement scrupulously avoided any reference to the other defendant. In addition, each defendant's statement included the same basic points regarding the fundamental facts of the crime, and thus each separately stated to the police in any event what the other said about the crime. Both defendants stated that they were at the scene of the crime and that they entered M.C.'s apartment through an unlocked glass sliding door. Both defendants also admitted they had sex with M.C., that they held her down while doing so, and that duct tape was used during the commission of the crime. Quite simply, each defendant told police the same story and thus there is no reasonable possibility that the the admission of the other's statement at trial without a limiting instruction

14

contributed in any meaningful way to his conviction. Thus, the trial court's error in failing to provide the requested limiting instruction was harmless.

### III. Detective Burris' Summaries Of Appellants' Statements To Law Enforcement Were Not Improper.

Isabel and Mario further argue that under the guise of complying with *Bruton*, the trial court improperly allowed the Commonwealth to present summaries of their statements to law enforcement that were incorrect and misled the jury. At trial, Isabel moved the court to prohibit the Commonwealth from presenting testimony by Detective Burris summarizing the statements. Mario joined that motion. As such, the issue is preserved for our review. KRE 103; RCr 9.22.

The trial court denied the motions and allowed the Commonwealth to present evidence summarizing each defendant's statement to law enforcement. Isabel now takes issue with two portions of Detective Burris' testimonial summary as purportedly misrepresenting what Isabel said during his statement. First, during Isabel's statement to law enforcement, the following exchange occurred regarding whether M.C. had consented to sex on the day of the attack:

> Detective Burris: But she didn't want to have sex.
>
> Isabel: Okay, yeah. I asked that a couple times because we have sex before then.
>
> Detective Burris: Right.
>
> Isabel: Mm-hmm [affirmative].
>
> Detective Burris: But that day she didn't want to have sex.

15

> Isabel: Okay, I asked them, and then that Mario told me that we have, and then I say no.
>
> Detective Burris: But she didn't want to have sex.
>
> Isabel: Mm-hmm [affirmative].
>
> Detective: Right?
>
> Isabel. Yeah, So I told Mario –
>
> Detective Burris: [interrupting] Let me lay it out for you the way that I think it went . . .

Detective Burris did not ask Isabel any further during his interview whether M.C. had consented to have sex on the day of the attack. At trial, Detective Burris summarized Isabel's statement as follows:

> Prosecutor: I think the question I asked you was whether or not um you asked Isabel whether [M.C.] wanted to have sex that day?
>
> Detective Burris: That's correct.
>
> Prosecutor: And what did he advise?
>
> Detective Burris: He advised she did not.

Isabel now argues that Detective Burris' summary of his statement was misleading because he was not admitting that M.C. did not want to have sex on the day of the attack. Isabel contends rather that his responses of "okay" and "yeah" to Detective Burris' questions were not acknowledgements that M.C. had not consented, but rather verbal tics or acknowledgements that he had understood the question. Isabel asserts that the jury was deprived of the opportunity to consider his statement itself, rather than only Detective Burris' summary of it, and thus the jury had no opportunity to evaluate whether in fact Isabel had meant to indicate M.C. had not consented.

16

We find no error in the admission of Detective Burris testimony summarizing Isabel's statement. Certainly, Isabel correctly points out that one reasonable interpretation of his statement was simply that he was acknowledging that he understood the questions rather than agreeing that M.C. did not want to have sex on the day of the attack. However, Isabel's statement is also susceptible to another reasonable interpretation, namely that he was answering Detective Burris' inquiries by affirmatively agreeing that M.C. did not want to have sex. Indeed, when Detective Burris stated "she didn't want to have sex," Isabel responded "okay, yeah."

It thus was not misleading for Detective Burris to testify that Isabel stated M.C. did not want to have sex on the day of the crime. Of course, Isabel had the opportunity to—and did—cross-examine Detective Burris and thereby present his own interpretation of the statement to the jury. Defense counsel also pointed out on cross-examination that Detective Burris did not directly ask Isabel if he had raped M.C. and did not use the actual word "consent" during the interview. The jury thus was able to consider the statements and determine for itself their meaning. Thus, because Isabel's statements were susceptible of the meaning testified to by Detective Burris at trial and because Isabel had an opportunity to cross-examine Detective Burris regarding that interpretation, there was no error in the trial court's admission of that testimony.

The second portion of Detective Burris' testimony to which Isabel objects is his summary of Isabel's statement regarding his and Mario's intention to use

17

a card to enter her apartment.  During Isabel's interview with law enforcement,

the following exchange occurred:

> Detective Burris:  You knew that he [Mario] was wanting to use the card to get in to see her.
>
> Isabel:  Hm-Mmm [negative] No one tell me that, but I don't know.
>
> Detective Burris:  He didn't tell you that?
>
> Isabel:  Hm-Mmm [negative]
>
> Detective Burris:  Okay.  Do you have, did you think that that was what was gonna happen?
>
> Isabel:  Yeah.
>
> Detective Burris:  You think that's what, what he was using it for?
>
> Isabel:  Mm-Hmm [affirmative]
>
> . . .
>
> Detective Burris:  You all used a credit card to get into the apartment, right?
>
> Isabel:  No.
>
> Detective Burris:  [Crosstalk] Did you try?
>
> Isabel:  No, that was just took the door that that door is open.
>
> Detective Burris:  The door was open?  Nobody pulled a credit card out?
>
> Isabel:  No.
>
> Detective Burris:  Okay.  There's a credit card that belongs to Mario laying right outside of the door.  . . . So why was that laying outside of that door?
>
> Isabel:  Okay.  That Mario told me that he, he hoped to use the, the credit card for that.

Detective Burris: So Mario told you that he had to use the credit card to get in?

Isabel: Mm-Hmm [affirmative] Yeah, but I just, uh . . .

Detective Burris: Were you going in behind Mario? Did Mario use the credit card to get the door open and you went in behind him?

Isabel: No, nobody used the credit card, we just to open the door. Just, I touched the door. That was the door that was unlocked.

[Officer Guandique asks a question in Spanish, and Isabel responds.]

Officer Guandique: They were gonna use the card but the door was already unlocked, so . . .

Detective Burris: So you didn't have it?

Isabel: Yeah.

Detective Burris: But she didn't invite you in that morning?

Isabel: Hm-mmm [negative]

Thus, though Officer Guandique translated Isabel's statement when it was made as "*they* were gonna use the card but the door was already unlocked," Detective Burris testified at trial that Isabel had said "*he* was going to use the card." Isabel asserts because the jury was not provided this complete portion of the statement, it could not consider whether his words actually reflect that Mario, not Isabel, was going to use a card to break into M.C.'s apartment.

Again, we find no error. "They" is plural and thus the statement as translated by Officer Guandique plainly indicated both Mario *and* Isabel were going to use the card. The statement is not fairly susceptible to any

19

interpretation that *only* Mario, and *not* Isabel, planned to use the card. Thus, though perhaps incomplete, the statement at trial that *Isabel* was going to use the card was still a fair summary of the statement. In addition, it is plain that the incompleteness arose only from Detective Burris' efforts to change "they" to "he" and thereby avoid an incrimination of Mario via a statement by Isabel that Mario would have no opportunity to cross-examine. Detective Burris' summaries of the statements were appropriate and in no way mislead the jury.

Isabel also argues Detective Burris' testimony summarizing Isabel's statement violated the rule of completeness. That rule, set forth in KRE 106, provides that "[w]hen a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it." A party seeking to admit otherwise inadmissible evidence under this rule "may only do so to the extent that an opposing party's introduction of an incomplete out-of-court statement would render the statement misleading or alter its perceived meaning[.]" *Rodgers v. Commonwealth*, 285 S.W.3d 740, 748 (Ky. 2009) (quoting *Schrimsher v. Commonwealth*, 190 S.W.3d 318, 330-31 (Ky. 2006)). As noted above, however, Detective Burris' testimony as to Isabel's statement was entirely consistent with the words used by Isabel, and thus was not misleading so as to require admission of the entire statement under the rule of completeness.

20

Isabel further argues Detective Burris' summary of his statement also violated our rule against a witness interpreting a recording for the jury. Under that rule, courts should refrain from allowing a witness to interpret for the jury what is on a recording, because "[i]t is for the jury to determine as best it can what is revealed in the tape recording without embellishment or interpretation by a witness." *Gordon v. Commonwealth*, 916 S.W.2d 176, 180 (Ky. 1995). Notably, however, this rule is limited to circumstances where a witness tells the jury what is *on* a recording, and in no way bars the witness from testifying "as to his recollection of what was said." *Id.* Thus, while a witness may not tell the jury what an audio recording reveals that a person said, they may independently testify to their own recollection of what was said. *Id.* Here, Detective Burris did not purport to interpret the recording for the jury. Indeed, the recording was not even played for the jury. Rather, Detective Burris simply testified to his recollection of what Isabel said in his statement. Thus, there was also no violation of our rule prohibiting witnesses from interpreting a recording for the jury. In sum, we find no error in Detective Burris' testimony summarizing Isabel's statements to law enforcement.

## IV.     The Admission Of Translated Text Messages Was Not Error.

Isabel and Mario next argue that the trial court erred in admitting their text messages as translated by Officer Guandique. Isabel and Mario both argue that admission of the translated text messages violated the Confrontation Clause. Isabel further asserts that the admission of that

21

evidence also violated hearsay rules and our holding in *Lopez*, 459 S.W.3d at 873, that inaccurate and misleading translations may be excluded.

During the course of his investigation, Detective Burris obtained text messages between Isabel and Mario and between Mario and M.C., all of which were in Spanish. Detective Burris did not speak Spanish and thus asked his colleague Officer Guandique to translate the messages. Like Isabel and Mario, Officer Guandique is a Spanish speaker from Guatemala.

The text messages indicated that before the attack, Isabel and Mario texted about gaining entry to M.C.'s apartment through use of a card. Police located Mario's credit card at the scene. Isabel and Mario also texted about the need to obtain "ties" to bind M.C. After the attack, Isabel texted Mario saying not to tell anyone what happened and not to tell anyone Isabel was with him. Isabel and Mario also texted regarding what M.C. might have told police, what she knew about Isabel and where he lived, what Gabriel could tell them about what M.C. had told police, whether there were cameras at M.C.'s apartment, and the need to delete their text messages.

At trial, Mario objected to admission of the text messages on grounds that Officer Guandique's translations were inaccurate or at least open to debate. Mario's counsel, a Spanish speaker, argued the translation was inaccurate because Officer Guandique offered an English translation "I think that I do have one" of an original Spanish statement "yo creo que si tengo" even though the original Spanish statement did not include "uno," the Spanish word for "one." However, no actual proof beyond argument of counsel, such as an

22

expert, translator, or other witness to testify to the alleged errors in the translations, was provided to the trial court. Mario further raised the issue of his inability to cross-examine Officer Guandique, who did not testify at trial. Isabel joined in Mario's motion, arguing that his rights under the Sixth Amendment Confrontation Clause would be violated because Officer Guandique was not present to testify regarding his translations. As such, this issue is preserved. KRE 103; Rcr 9.22.

The trial court overruled these motions. The trial court concluded that the translation could not be excluded unless the defendants presented proof, apart from the representations of an attorney, that the translation was inaccurate or misleading. The trial court further held that admission of the translation also did not implicate Confrontation Clause concerns.

We agree with the trial court that the Confrontation Clause does not require cross-examination of a language interpreter, and thus there was no Confrontation Clause violation in the admission of Officer Guandique's translations. In considering the admissibility of a translation, we have long held that "an interpreter [is] a 'mere conduit by which the testimony'" of a witness is conveyed to the jury. *Lopez*, 459 S.W.3d at 873 (quoting *Fletcher v. Commonwealth*, 123 Ky. 571, 96 S.W. 855, 857 (1906)). Thus, "[w]hen an interpreter is simply translating what a witness says, then the interpreter is acting merely as a conduit and, if the non-English speaking declarant's testimony would otherwise be admissible, the use of an interpreter to translate that testimony does not render it inadmissible." *Id.*

23

Though we reached this holding in considering our hearsay rules, persuasive rulings by courts in other jurisdictions have reached the same conclusion regarding the Confrontation Clause. As noted above, the Confrontation Clause applies only to "witnesses" against a criminal defendant, *i.e.* those bearing "[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact." *Crawford*, 541 U.S. at 51 (citation omitted). As the Supreme Court of Minnesota has persuasively explained, as a mere conduit of information, an interpreter is not a "witness" against the defendant because the interpreter does not make a solemn declaration or affirmation for the purpose of establishing or proving a fact, but rather simply enables the fact-finder to understand the words of the person whose words are translated:

> The role of the interpreter is not to provide or vary content; the role of the interpreter is to relay what the defendant said in another language. In this way, an interpreter is not a witness against the defendant. . . . The interpreter is simply the vehicle for conversion or translation of language. . . . The interpreter simply makes the language-conversion process more efficient and effective. . . . The Confrontation Clause is not implicated because the act of processing the statement from one language to another does not transform the interpreter into a witness against the defendant.

*State v. Lopez-Ramos*, 929 N.W.2d 414, 419-20 (Minn. 2019). We agree and thus conclude that the Confrontation Clause does not require an opportunity for cross-examination of a language interpreter such as Officer Guandique.

Isabel and Mario further argue that Officer Guandique's translations should have been excluded because they were inaccurate or misleading. We have held that "in certain circumstances the trial court may be justified in excluding testimony based on a translated statement, such as when the

24

translation is inaccurate or misleading." *Lopez*, 459 S.W.3d at 873. However, no such showing was presented to the trial court here. Indeed, the only alleged translation deficiency identified by the defendants was counsel's assertion that "yo creo que si tengo" was translated as "I think that I do have one" despite the original Spanish not including the Spanish word for "one." There was no explanation of why this particular phrasing might be impactful at trial, and no evidence was offered beyond argument of counsel that it was even incorrect. "I think that I have it" and "I think that I do have one" are not significantly different in meaning. Nor did the defendants offer any other substantive evidence, such as an affidavit or expert witness, to support a finding that Officer Guandique's translations suffered from relevant deficiencies. Thus, because the Appellants made no showing of any actual relevant issue with the translations, the trial court did not err in admitting those translations.

**V. The Trial Court Correctly Applied KRE 412 To Exclude Evidence Of Alleged Prior Consensual Sexual Activity Between Isabel, Mario, and M.C.**

Isabel and Mario also argue that the trial court erred in excluding evidence of alleged prior consensual sexual activity involving Isabel, Mario, and M.C. under KRE 412. KRE 412 provides that "[e]vidence offered to prove that any alleged victim engaged in other sexual behavior" is generally inadmissible. KRE 412 (a)(1). The purpose of this Rule is "both to shield the victims of sex crimes from painful and embarrassing questions and disclosures about their private sexual activities as well as to preserve the fairness of the proceedings by excluding irrelevant attacks on the victim's character and guarding against

25

distracting the jury with collateral matters." *Powers v. Commonwealth*, 626 S.W.3d 563, 566 (Ky. 2021) (quoting *Montgomery v. Commonwealth*, 320 S.W.3d 28, 39 (Ky. 2010)).

However, the Rule includes an exception under which "evidence of specific instances of sexual behavior by the alleged victim with respect to the person accused of the sexual misconduct" is admissible when "offered by the accused to prove consent[.]" KRE 412(b)(1)(B). Nonetheless, this and other exceptions set forth in KRE 412 "are to be used 'sparingly and carefully.'" *Powers*, 626 S.W.3d at 566 (quoting *Violett v. Commonwealth*, 907 S.W.2d 773, 776 (Ky. 1995)). Indeed, in applying KRE 412, we have noted that it includes "an obvious tilt toward exclusion over admission." *Commonwealth v. Dunn*, 899 S.W.2d 492, 494 (Ky. 1995).

Isabel filed a motion before trial seeking to admit such evidence. In his motion, Isabel asserted that M.C. began to have sex with Mario at least two years before the incident in question, and eventually also began to have sex with Isabel. Isabel further contended that M.C. had sex with him and Mario both independently and jointly, and that at her request the sexual activity at times included restraint of M.C. by one or both of them. Isabel also asserted that over time M.C.'s desire for restraint became more pronounced and that M.C. eventually introduced the use of certain devices such as handcuffs and "ball gags" into the sexual activity. Isabel further maintained that M.C. had on prior occasions voluntarily given Isabel and Mario access to her apartment.

26

The original presiding judge, Judge Easton, held a hearing regarding Isabel's motion. Mario's counsel was present and asserted an interest in the proceedings. However, the trial court concluded that because Mario had not filed a separate motion, KRE 412 required the exclusion of him and his counsel from the hearing. The hearing therefore proceeded without Mario or his counsel present.

During the hearing, Isabel did not present proof to support the allegations set forth in his motion, aside from argument by his counsel. Isabel's counsel asserted there may have been a total of three prior incidents of consensual sexual behavior, and that the most recent incident had occurred three months before the attack. A law enforcement detective testified that statements by Isabel and Mario during their interviews suggested they intended to break into M.C.'s apartment, that she did not request sex on the day of the attack, and that no bondage devices were located in M.C.'s apartment.

The trial court denied Isabel's motion, reasoning that whether or not M.C. had previously had sex with Mario and Isabel was not relevant to whether she consented on the day of the attack, regardless of the type of sex involved. The trial court further concluded the evidence would be highly prejudicial to the Commonwealth, as it could lead the jury to conclude M.C. had consented on the day of the attack because she allegedly had engaged in similar types of acts involving restraint before. The trial court also stated the evidence would be embarrassing to M.C.

27

Isabel argues he should have been able to present evidence of M.C.'s alleged prior sexual conduct, and that the trial court's denial of his motion deprived him of his right to present a defense. Mario argues further that the trial court also erred in excluding him and his counsel from joining the motion or participating in the hearing. Finally, Mario also asserts the trial court erred in failing to include M.C. in the proceedings.

Isabel's argument that trial court erred in failing to admit evidence of prior consensual sexual activity between M.C., Isabel, and Mario is preserved given his pre-trial motion to admit that evidence. KRE 103(a). As with other rulings regarding the admission or exclusion of evidence, we review a trial court's application of KRE 412 for abuse of discretion. *Dunn*, 899 S.W.2d at 493. "The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Powers*, 626 S.W.3d at 566 (quoting *Goodyear Tire & Rubber Co. v. Thompson*, 11 S.W.3d 575, 581 (Ky. 2000)).

Here, Isabel sought to introduce unsubstantiated evidence that M.C. had previously engaged in consensual sex with the defendants, including sex involving the use of restraints, to prove that she also consented to sex on the day of the attack. At first blush, this appears to fit squarely within KRE 412's exception for evidence offered to prove consent. Notably, however, KRE 412 allows the admission of such evidence only if it is also "otherwise admissible" under the Rules of Evidence. KRE 412(b)(1). One such rule of course is KRE 403, which allows the exclusion of otherwise relevant evidence "if its probative

28

value is substantially outweighed by the danger of undue prejudice[.]" Thus, even if evidence may otherwise be admissible under KRE 412, it may be excluded if it presents a risk of undue prejudice that substantially outweighs its probative value.

Such is the case here. First, Isabel's allegations of prior consensual sexual activity was of little, if any, probative value as to the issue of consent. Indeed, Isabel presented *no* evidence to support his claim that M.C. had previously engaged in consensual sex with the defendants. Instead, he relied solely only argument by his counsel that the incidents had occurred. Notably, law enforcement also did not locate any of the types of restraints allegedly used by M.C. or any other evidence that might corroborate Isabel's allegations. Finally, we have previously noted in any event that prior instances of allegedly consensual sexual activity generally do not make it any more likely that the sexual conduct at issue at trial was consensual. *Mayo v. Commonwealth*, 322 S.W.3d 41, 49 (Ky. 2010) ("Solely for the sake of analysis, we shall assume that the victim did have consensual anal sex with [defendant] in the past. That does not mean, however, that she consented to having anal sex—or any other type of sex—with [defendant] on the date in question.") Thus, we conclude Isabel's allegations as to M.C.'s alleged prior consensual sexual activity was of little, if any, probative value as to the issue of consent.

On the other hand, allowing the defendants to allege at trial that M.C. had previously engaged in consensual sexual relations with the defendants involving the use of restraints and other devices would have resulted in

29

significant prejudice to the prosecution and M.C. The presentation of such allegations also would subvert the purpose of KRE 412 in protecting victims from painful and embarrassing allegations and disclosures regarding their purported prior sexual activities. Accordingly, because the risk of undue prejudice heavily outweighed the probative value of Isabel's allegations, we find no abuse of discretion in the trial court's ruling excluding those allegations from trial.

That said, we do agree with Mario that the trial court erred in excluding him from the hearing regarding Isabel's KRE 412 motion. Although Isabel filed such a motion and Mario did not, KRE 412 nonetheless requires the court to conduct a hearing that affords "the victim and *parties* a right to attend and be heard." KRE 412(c)(2) (emphasis added). In cases that will involve a multi-defendant trial, all of the co-defendants have an interest in the evidence presented at trial and thus are "parties" entitled to be present at a KRE 412 hearing. This is true even where, as here, each defendant may have a separate case number. As such, the trial court erred in excluding Mario from the hearing regarding Isabel's KRE 412 motion.

However, we conclude any such error was, at most, harmless. Notably, Mario never filed a separate motion or sought admission of any additional evidence under KRE 412 beyond what Isabel alleged. Thus, there is no basis to conclude that the exclusion of Mario from the hearing resulted in the exclusion of evidence otherwise admissible under KRE 412. Finally, error in the trial court's failure to include M.C. in the hearing—if any—also was at most

30

harmless, as the trial court in any event ultimately excluded the evidence that would have been painful and embarrassing for M.C. As such, the trial court's hearing and rulings regarding Isabel's KRE 412 motion do not warrant reversal.

## VI. Though Erroneous, The Trial Court's Admission Of Mario's Threatening Text Message To M.C. Was Harmless.

Isabel and Mario next argue that the trial court erred in admitting a text Mario sent M.C. after the attack that included threatening language. After the attack, Mario sent M.C. a text message asking why she needed his address, and M.C. responded there was no reason. Mario then texted M.C. "if something happens to me, I'll kill you. I know your address. I don't remember the number, but I know the street." The Commonwealth sought to admit these texts on the basis that they explained M.C.'s absence from trial, and because they were made by a party opponent. Shortly after these texts, Mario texted M.C. "I've done nothing to you" and M.C. responded "I know," though the trial court declined Mario's request that these texts also be admitted under the rule of completeness.

Before the texts were admitted at trial, Isabel and Mario objected on ground of irrelevance, undue prejudice, hearsay, and incompleteness. This issue is therefore preserved. KRE 103; RCr 9.22. The trial court found the texts admissible to show why M.C. was not present at trial, and because they were statements by a party opponent.

As an initial matter, we note that Mario's statement was not inadmissible hearsay when admitted against him because he was the maker of the statement. KRE 801A(b)(1) provides that a statement is not barred by the

31

hearsay rule if it is offered against a party and is "[t]he party's own statement[.]" Here, Mario sent the threatening text message to M.C., and thus the hearsay rules did not bar its admission against him at trial. However, because Isabel did *not* make the statement, it remained inadmissible hearsay as to him and its admission against him was error.

The trial court's refusal to admit the subsequent texts in which Mario told M.C. he had done nothing to her and to which M.C. responded "I know" also violated the rule of completeness. As noted above, that rule provides that "[w]hen a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it." KRE 106. Fairness requires admission of the excluded portion when the "opposing party's introduction of an incomplete out-of-court statement would render the statement misleading or alter its perceived meaning." *Schrimsher*, 190 S.W.3d at 330-31. However, the Rule allows admission of only those additional portions of the statement necessary "to correct or guard against any likely misperception that would be created by an opponent's presentation of a fragmented version of the statement." *Id.* at 331. We review a trial court's application of KRE 106's rule of completeness for abuse of discretion. *See id.* at 330 ("A trial court's ruling under KRE 106 (*i.e.*, the 'rule of completeness') is discretionary.")

Here, the trial court admitted only Mario's text threatening that "if something happens to me, I'll kill you." In the context of the criminal trial on

32

the Commonwealth's charges that Mario had raped M.C., a reasonable juror might understand the statement as indicative of guilt insofar as it suggests an effort by Mario to prevent M.C. from revealing the crime. However, the subsequent additional texts in which Mario tells M.C. he did nothing to her, and to which M.C. responded "I know" could reasonably be understood as indicative of a far different meaning: namely, that Mario was threatening M.C. that if she *falsely* accused him of a crime, he would kill her. Thus, because the excluded messages reasonably could have altered the jury's perceived meaning of the admitted messages, the trial court should have admitted the excluded portions.

However, we conclude that the trial court's erroneous admission of the text messages against Isabel and its application of KRE 106 was harmless. An error may be deemed harmless if we "can say with fair assurance that the judgment was not substantially swayed by the error." *Winstead v. Commonwealth*, 283 S.W.3d 678, 688-89 (Ky. 2009). We thus ask "whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand." *Id.* at 689 (quoting *Kotteakos v. United States*, 328 U.S. 750, 765 (1946)). Here, we find no basis to conclude admission of Mario's threatening message to M.C. had substantial influence on the defendants' convictions. First, the Commonwealth introduced the messages not in the context of establishing guilt, but rather to explain its inability to produce M.C. at trial. More particularly, the prosecution elicited testimony regarding the content of the messages in the course of a line of questioning as to why M.C.

33

was not present at trial. Thus, this context reduced the potential for the jury to rely on the text messages as evidence of guilt.

Second, the remaining evidence at trial in any event overwhelmingly demonstrated the defendants' guilt. Surveillance video showed Isabel's vehicle arriving at M.C.'s home the morning of the rape. The physical injuries suffered by M.C. were extensive, including not only injuries to her vagina and anus but also contusions and abrasions on her forearms, wrist, hand, and ear. The SANE Nurse also testified it was not probable such injuries could result from consensual sex. The binding of M.C.'s legs after the attack further supported a finding that the attack was not consensual. The evidence also plainly established that Mario and Isabel were the perpetrators of the attack. In addition to the statements to law enforcement admitting they had sex with M.C. on the day in question and had done a "bad thing," the location of Mario's credit card at the scene and of duct tape in Isabel's car clearly established their responsibility for the crime. Moreover, the Appellants exchanged text messages both before and afterwards regarding the attack and their efforts to conceal it. In light of this overwhelming evidence of the defendants' guilt, we simply cannot find that the threatening text message or the trial court's omission of additional portions of the messages had a substantial influence on the jury's verdicts.[6]

---

[6] Because we conclude admission of the text messages resulted at most in harmless error, we need not consider further Mario's argument that the messages constituted a prior bad act inadmissible under KRE 404(b).

34

## VII. The Trial Court Did Not Err In Refusing To Suppress Isabel's Statement To Law Enforcement.

Isabel next argues the trial court erred in refusing to suppress his statement to law enforcement. Before trial, Isabel moved the trial court to exclude the statement on grounds the Commonwealth failed to prove Isabel was given proper *Miranda* warnings. As such, this issue is preserved. *Nichols v. Commonwealth*, 142 S.W.3d 683, 691 (Ky. 2004).

In reviewing a trial court's ruling on a motion to suppress, we apply a two-part analysis. We first review the trial court's findings of fact for clear error, and thus "defer to the trial court's fact finding if it is supported by substantial evidence." *Cox v. Commonwealth*, 641 S.W.3d 101, 113 (Ky. 2022). We then review "the trial court's application of the law to the facts *de novo.*" *Id.* In the context of waivers of *Miranda* rights, we have taken the U.S. Supreme Court's direction that appellate courts must "make an independent evaluation of the record" as requiring that we review *de novo* the determination of whether a defendant's waiver of rights was knowing, voluntary, and intelligent. *Dillon v. Commonwealth*, 475 S.W.3d 1, 10 (Ky. 2015) (quoting *Mincey v. Arizona*, 437 U.S. 385, 398 (1978)).

Before taking Isabel's statement, Detective Burris asked Isabel if he understood English "perfectly fine," and Isabel responded "not really, I think it's about 40%." Detective Burris then read Isabel a summary listing of *Miranda* rights in English. When Detective Burris asked Isabel if he understood, Isabel began speaking in Spanish to Officer Guandique. Officer Guandique showed Isabel a Spanish-language rights waiver on his phone.

Isabel looked at it for approximately forty seconds. However, the record at trial did not include an actual copy of what Officer Guandique showed Isabel. When Isabel finished looking at the phone, Detective Burris asked him if he understood, and Isabel said "mm-hmm" in the affirmative. Detective Burris then asked Isabel to sign his name on a form, which Isabel did. Detective Burris then took Isabel's statement.

Isabel moved to suppress the statement. The trial court held an evidentiary hearing, during which the Commonwealth offered testimony that Officer Guandique had shown Isabel a Spanish-language rights waiver on his phone. However, Detective Burris did not produce a copy of what was shown to Isabel on the phone, nor did he have personal knowledge of the document's precise contents. Regarding Isabel's English language skills, Detective Burris testified that Isabel "primarily understood English. There were times where I'd have to repeat a question and Officer Guandique would also translate to make sure that he understood."

Isabel's father testified that in Guatemala, Isabel had been instructed mostly in his native indigenous language, and that he mostly learned Spanish after arriving in the U.S. The trial court held an evidentiary hearing and ultimately denied the motion, concluding that Isabel understood English well enough to understand the warnings read to him by Detective Burris, and that Isabel also fully read the waiver form in Spanish as well without asking questions or indicating he did not understand.

36

Isabel now argues the Commonwealth failed to meet its burden of proving that Isabel was given *Miranda* warnings and that he knowingly, voluntarily, and intelligently waived his rights. We disagree.

Under *Miranda*, a suspect subjected to custodial interrogation

> must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires. . . .
>
> After such warnings have been given, and such opportunity afforded him, the individual may knowingly and intelligently waive these rights and agree to answer questions or make a statement. But unless and until such warnings and waiver are demonstrated by the prosecution at trial, no evidence obtained as a result of interrogation can be used against him.

*Miranda v. Arizona*, 384 U.S. 436, 479 (1966). For a waiver of rights under *Miranda* to be effective, the waiver must be voluntary, knowing, and intelligent:

> That inquiry has two parts, both of which must be shown by the totality of the circumstances. First, the waiver "must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." "Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it."

*Dillon*, 475 S.W.3d at 13 (citations omitted) (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)). In determining whether a waiver is valid, "we must consider the totality of the 'particular facts and circumstances surrounding [the] case, including the background, experience, and conduct of the accused.'" *Cox*, 641 S.W.3d at 114 (quoting *Edwards v. Arizona*, 451 U.S. 477, 482 (1981)). The

Commonwealth bears the burden of showing that a defendant's waiver of rights was voluntary, knowing, and intelligent. *Dillon*, 475 S.W.3d at 14.

Here, Isabel does not challenge the voluntariness of his waiver, but rather whether the Commonwealth has shown the waiver was made knowingly and intelligently. However, we find no error in the trial court's conclusion that the Commonwealth met its burden. As noted above, while the trial court did not receive into evidence the warnings shown to Isabel, Detective Burris testified that Officer Guandique showed Isabel Spanish-language *Miranda* warnings on his phone. The record further reveals that Isabel spent some time reviewing those warnings, told Detective Burris that he understood them, and then signed a waiver form. This evidence was sufficient to meet the Commonwealth's burden to demonstrate that Isabel waived his rights with full awareness of the rights he was abandoning and the consequences of that decision. Moreover, no evidence was presented to dispute that what Officer Guandique showed Isabel was a proper and accurate Spanish-language *Miranda* warning, or that would otherwise call into question the knowing and intelligent nature of Isabel's waiver. As such, the trial court properly denied Isabel's motion to suppress.

### VIII. The Trial Court Did Not Err In Refusing To Suppress Mario's Statement To Law Enforcement.

Mario also separately argues the trial court should have suppressed his statement to law enforcement. At the time he spoke to law enforcement, Mario was a seventeen-year-old in eleventh grade. Like Isabel, Mario spoke an indigenous language, with Spanish as a second language and English as his

38

third language. Mario told Detective Burris he understood English "50/50." Detective Burris testified Mario had no difficulty communicating with him, and the he seemed to understand things "pretty well."

Detective Burris read Mario *Miranda* warnings in English and then asked Mario if he understood. Mario responded "just a little bit." Officer Guandique then handed Mario a Spanish-language document to review on his phone. Again, no copy of the document was preserved. Mario verbally indicated that he understood and signed a copy of a rights waiver. Mario moved to suppress his statement. This issue is therefore preserved. *Nichols*, 142 S.W.3d at 691.

The trial court conducted a suppression hearing regarding the motion. The trial court denied Mario's motion, concluding that Mario understood the English language *Miranda* warnings and also noting Mario's careful review of the Spanish-language document shown to him by Officer Guandique. Mario now argues there is no means by which the trial court could have determined that the Spanish language *Miranda* warnings reasonably conveyed those warnings.

Again, we find no error in the trial court's ruling. As with Isabel, the record established that Mario was provided with *Miranda* warnings in both English and Spanish, and no proof was presented that brings into question the adequacy and accuracy of those warnings. Nor was any proof presented that would otherwise call into question that Mario knowingly and intelligently waived his rights. As such, the trial court did not err in denying Mario's motion to suppress his statement.

## IX. The Trial Court Did Not Abuse Its Discretion In Refusing To Strike Juror 149.

Isabel next argues the trial court erred in refusing to strike Juror 149. During voir dire, Juror 149 disclosed that he had a friend who was drugged and raped in 2010 and who had killed herself, and that his daughter also had been sexually assaulted a few years earlier. When asked how these facts might affect his ability to hear evidence, Juror 149 stated "I'm not really sure. . . . I have a real bad anxiety problem, a problem that is, I couldn't tell you whether or not it's gonna pan out good for me. It's hard to know." When asked if he could consider the full range of penalties, Juror 149 answered "I don't know, I've never been in this situation before, I couldn't tell you." And when asked whether his ability to hear all the evidence would be affected by evidence of use of force or photographs of the victim's injuries, Juror 149 answered "No. Yeah I think so." In addition, Juror 149 also had a prior professional relationship with Isabel's counsel, who served as his attorney in divorce proceedings.

Isabel asked the trial court to strike Juror 149 on grounds he had indicated he could not fully consider the evidence and full range of penalties. The trial court denied that request. Isabel used a peremptory strike to strike Juror 149, exhausted all remaining peremptory challenges, and indicated in writing on his strike sheet which juror he would have struck had Juror 149 been stricken by the trial court. That juror ultimately sat on the jury. As such, Isabel's argument is fully preserved. *See Floyd v. Neal*, 590 S.W.3d 245, 252 (Ky. 2019). We review a trial court's determination regarding a motion to strike a juror for abuse of discretion. *Walker v. Commonwealth*, 288 S.W.3d

729, 736 (Ky. 2009) ("We have 'long recognized that "a determination as to whether to exclude a juror for cause lies within the sound discretion of the trial court, and unless the action of the trial court is an abuse of discretion or is clearly erroneous, an appellate court will not reverse the trial court's determination.'") (quoting *Fugett v. Commonwealth*, 250 S.W.3d 604, 613 (Ky. 2008)).

Under our Rules of Criminal Procedure, a prospective juror is to be excused as not qualified "[w]hen there is reasonable ground to believe that [the] prospective juror cannot render a fair and impartial verdict on the evidence[.]" RCr 9.36(1). Thus, in determining whether a juror should be struck for cause, a trial court should consider whether "the prospective juror can conform his views to the requirements of the law and render a fair and impartial verdict." *Walker*, 288 S.W.3d at 736 (quoting *Thompson v. Commonwealth*, 147 S.W.3d 22, 51 (Ky. 2004)). This determination must be "based on the totality of the circumstances . . . [and] not on a response to any one question[,]" as it is the duty of the trial court to "evaluate the answers of the prospective jurors in context and in light of the juror's knowledge of the facts and understanding of the law." *Id.* (quotations omitted). The party alleging bias bears the burden of proving such bias and resulting prejudice. *Id.* Once such a showing has been made, the trial court "must weigh the probability of bias or prejudice based on the entirety of the juror's responses and demeanor." *Id.* at 737 (quoting *Shane v. Commonwealth*, 243 S.W.3d 336, 338 (Ky. 2007)).

41

Here, Juror 149's responses did not establish reasonable grounds to believe he could not render a fair and impartial verdict. First, the mere fact that Juror 149 had a daughter and a friend who suffered sexual assault did not, without more, warrant disqualification. Indeed, we have

> consistently held that the mere fact that a juror or her family member has been the victim of a crime similar to the one charged against the defendant does not, in and of itself, justify that juror's excusal. In those cases, additional evidence of bias is required, with "[o]bvious factors bearing on the likelihood of bias [being] the similarity between the crimes, the length of time since the prospective juror's experience, and the degree of trauma the prospective juror suffered."

*Little v. Commonwealth*, 422 S.W.3d 238, 242 (Ky. 2013) (citations omitted) (quoting *Brown v. Commonwealth*, 313 S.W.3d 577, 598 (Ky. 2010)). Here, there was no indication that the crimes referenced by Juror 149 bore any similarity beyond involving sexual assault to the crimes charged against Isabel and Mario. The crimes had occurred years before, and Juror 149's responses did not manifest any residual trauma sufficient to call into question his ability to fairly and impartially decide the case based upon the evidence presented. As such, disqualification was not warranted simply due to Juror 149's previous experiences with sexual assault crimes.

Nor did the prior role of Isabel's attorney as Juror 149's divorce counsel warrant disqualification. We have previously held that "a trial court is required to disqualify for cause prospective jurors who had a prior professional relationship with a *prosecuting* attorney and who profess that they would seek such a relationship in the future." *Fugate v. Commonwealth*, 993 S.W.2d 931, 938 (Ky. 1999) (emphasis added). Here, however, Juror 149 had a prior

42

professional relationship with *Isabel's* counsel, not with the prosecuting attorney. Moreover, for a juror to be struck the moving party must show not only bias, but also resulting prejudice. *Walker*, 288 S.W.3d at 736. While prejudice may arise in some circumstances when a prospective juror had a prior professional relationship with a *prosecuting* attorney, Isabel plainly faced no prejudice arising from the prior professional relationship between Juror 149 and his own counsel. There was no indication that Juror 149 was dissatisfied with the divorce representation provided by Isabel's counsel, or that he otherwise harbored any ill feelings toward the attorney. As such, the prior relationship between Juror 149 and Isabel's counsel did not require that Juror 149 be struck for cause.

Finally, neither Juror 149's responses that he was not sure if he could consider the full range of penalties or that he had anxiety and was not sure how that would play out, nor his equivocal response as to whether he would be affected by certain evidence, provided reasonable grounds to believe he could not fairly and impartially reach a verdict based on the evidence. Rather, when considered within the totality of the circumstances, his responses merely reflected the normal uncertainty attendant to any juror who has not yet fully heard the charges and evidence and who may be unfamiliar with the trial process. It is not unreasonable for an individual who has not yet heard the evidence to be unsure how they will react to the evidence. Thus, we find no abuse of discretion in the trial court's refusal to strike Juror 149.

**X.  The Trial Court Did Not Err In Allowing The SANE Nurse To Testify.**

Mario also argues separately that the trial court erred in allowing SANE Nurse Bashaw to testify.  Before trial, Mario filed a motion to exclude Nurse Bashaw's testimony and for a *Daubert* hearing on that issue.  This issue is thus preserved.  KRE 103; RCr 9.22.  "Rulings upon admissibility of evidence are within the discretion of the trial judge; such rulings should not be reversed on appeal in the absence of a clear abuse of discretion." *Simpson v. Commonwealth*, 889 S.W.2d 781, 783 (Ky. 1994).

The trial court held a hearing on the motion and denied the request for a *Daubert* hearing but ordered that Nurse Bashaw's testimony would be limited to observations and that she could not "give opinions on commission of charges by defendant."  At trial, Isabel's counsel asked Nurse Bashaw if she would agree people experience injuries not only from rape, but also from consensual sex.  Nurse Bashaw acknowledged that forceful, consensual sex can result in injuries.  Isabel's counsel also asked whether the types of injuries suffered by M.C. could hypothetically arise from consensual sex.  Nurse Bashaw responded that it was possible, though not probable.  Mario's counsel then asked Nurse Bashaw whether it was possible to have injuries from consensual sex without adequate lubrication, and Nurse Bashaw agreed that was possible.

On re-direct, the Commonwealth's counsel asked:

> Prosecutor:  [You were] asked a question about consensual versus non-consent and you had an answer that you said, um, you know, anything's possible but it's not probable.  I want, I wanna give you a chance to say, to say, why not.

44

> Nurse Bashaw: You know, like I said, I haven't, I haven't, I haven't seen that. I mean, is that, is that not, you know, that's not to say, you know, I don't, I don't work 24 7. That's not to say that there's not somebody out there that wouldn't come in with something to that extent. But I, I mean, I haven't seen that, you know, we do case review. Um, we do photography review. Um, **no one else in our group in the program has seen injury like that.** Um I mean, we just, **it's not, not common, not probable**.

(Emphasis added). Nurse Bashaw also testified similarly during a later exchange:

> Prosecutor: [F]rom your records at Baptist Health Hardin, there was at least that initial urine specimen that she had blood in her urine.
>
> Nurse Bashaw: Correct. Yes, absolutely.
>
> Prosecutor: Now, is that something normal that happens from consensual sex?
>
> Nurse Bashaw: No, it's not.

Later during trial, the jury asked a question about the date and time of the SANE exam, whether an interpreter was present, and the interpretation of the injuries by Nurse Bashaw. At trial, Nurse Bashaw also testified that her job was only to document injuries, not to say how they occurred.

Mario now argues that reversal is required because the trial court erred in allowing Nurse Bashaw to testify to the ultimate issue of consent, and because her testimony exceeded the scope of her expertise. We disagree for two reasons. First, we have held that "[a] sufficiently qualified witness may testify as to whether certain detailed occurrences would be a natural, sufficient, probable, or possible cause of a certain physical result[.]" *Stringer v. Commonwealth*, 956 S.W.2d 883, 889 (Ky. 1997) (quoting 32 C.J.S. *Evidence*, §

45

644). This is because "an opinion that a result is consistent with a factual scenario is not an opinion that the scenario occurred." *Id.* Moreover, the purpose of experts is to assist the trier of fact to understand the evidence or determine a fact issue, and jurors "usually do need the assistance of a medical expert in determining the cause of a physical condition in order to understand the evidence and determine the ultimate fact in issue." *Id.* at 890. Here, Nurse Bashaw testified that it would be improbable for the types of injuries suffered by M.C. to result from consensual sex. Our precedents allow such testimony, and there was no error in its admission at trial.

Second, even had Nurse Bashaw's opinions regarding the probability of injury from consensual sex been inadmissible, Mario opened the door to that testimony by first asking Nurse Bashaw about the issue. As noted above, the challenged testimony came only after Mario's counsel asked Nurse Bashaw about the possibility of the types of injuries suffered by M.C. resulting from consensual sex. In so doing, Mario suggested to the jury that M.C.'s injuries might be the result of consensual rather than non-consensual sex, and it then became permissible under the doctrine of curative admissibility for the Commonwealth to introduce evidence to the contrary. *Norris v. Commonwealth*, 89 S.W.3d 411, 414 (Ky. 2002) (noting that under the doctrine of curative admissibility, "a witness will make an inadmissible assertion and the opposing party is then permitted to introduce evidence to the contrary."). As such, we find no error in the admission of Nurse Bashaw's testimony.

## XI. Mario Was Not Entitled To A Directed Verdict.

Mario also separately argues that the trial court should have granted a directed verdict in his favor on all charges for lack of evidence to support a finding of lack of consent. At the close of the Commonwealth's case, Mario moved for a directed verdict. He renewed his motion after the defense presented no witnesses. He also filed a motion for judgment notwithstanding the verdict after trial. This issue is therefore preserved.

Our standards for considering motions for directed verdict in criminal cases are well established:

> On motion for directed verdict, the trial court must draw all fair and reasonable inferences from the evidence in favor of the Commonwealth. If the evidence is sufficient to induce a reasonable juror to believe beyond a reasonable doubt that the defendant is guilty, a directed verdict should not be given. For the purpose of ruling on the motion, the trial court must assume that the evidence for the Commonwealth is true, but reserving to the jury questions as to the credibility and weight to be given to such testimony.

*Commonwealth v. Benham*, 816 S.W.2d 186, 187 (Ky. 1991). "[T]here must be evidence of substance, and the trial court is expressly authorized to direct a verdict for the defendant if the prosecution produces no more than a mere scintilla of evidence." *Id.* at 187-88. When reviewing a trial court's decision regarding directed verdict in a criminal case, our test "is, if under the evidence as a whole, it would be clearly unreasonable for a jury to find guilt, only then the defendant is entitled to a directed verdict of acquittal." *Id.* at 187.

Here, Mario asserts he was entitled to a directed verdict on the rape, kidnapping, and burglary charges because M.C. did not testify, and thus there

was no direct evidence that M.C. did not consent to his entry into her home and the sexual attack that occurred there. Mario contends the only evidence of a lack of consent were M.C.'s injuries and testimony by third parties, and thus the jury could only improperly infer guilt. We disagree.

Plainly, a conviction may be obtained even in the absence of testimony by the victim of the crime. Were the rule otherwise, a murder conviction would be legally impossible. Moreover, we have often noted that "direct proof of guilt is not necessary. Instead, the Commonwealth can prove all the elements of a crime by circumstantial evidence." *Southworth v. Commonwealth*, 435 S.W.3d 32, 42 (Ky. 2014).

Here, the evidence presented by the Commonwealth was sufficient to withstand a motion for directed verdict for failure to prove a lack of consent. The Commonwealth presented proof at trial that Isabel and Mario texted before the attack about using a card to enter M.C.'s home and using ties to bind her. The jury also heard about Isabel's statements to law enforcement that M.C. did not invite them to her home that day and did not want to have sex with them that day. The testimony also established that Isabel and Mario used duct tape during the attack and that they also bound M.C.'s legs with duct tape after the attack. This evidence alone was sufficient to allow a reasonable conclusion that M.C. did not consent. Beyond this evidence, the jury also heard testimony regarding the injuries suffered by M.C. and that it would not be probable for such injuries to result from consensual sex. Thus, because it would not have been clearly unreasonable for the jury to determine on the basis of this

48

evidence that M.C. did not consent to the entry into her home and subsequent sexual attack, the trial court correctly denied Mario's motions for directed verdict.

Finally, Mario also argues he was entitled to a directed verdict on the kidnapping charge because any restraint of M.C. was incidental to the rape. Kentucky Revised Statute ("KRS") 509.050 provides that a person may not be convicted of kidnapping

> when his criminal purpose is the commission of an offense defined outside [KRS Chapter 509] and his interference with the victim's liberty occurs immediately with and incidental to the commission of that offense, *unless the interference exceeds that which is ordinarily incident to commission of the offense which is the objective of his criminal purpose.*

(Emphasis added). Here, M.C. was not deprived of her liberty solely by force that would ordinarily be incident to the commission of rape, such as being trapped in a particular location or being physically held down. Rather, the interference with M.C.'s liberty greatly exceeded such force, including both binding and blindfolding of her face and eyes with duct tape during the actual commission of the offense, as well as the additional binding of M.C.'s legs with duct tape after the rape was over. As such, Mario did not fall within the exemption set forth in KRS 509.050 and thus also was not entitled to a directed verdict under that statute. Accordingly, the trial court did not err in denying Mario's motions for directed verdict.

## CONCLUSION

For the foregoing reasons, we affirm the sentence and judgment of the Hardin Circuit Court.

All sitting. Lambert, C.J.; Bisig, Goodwine, and Thompson, JJ., concur. Nickell, J., concurs in result only by separate opinion in which Conley and Keller, JJ., join.

NICKELL, J., CONCURRING IN RESULT ONLY: Respectfully, I concur in result only and write separately to address the admissibility of the translated text messages. In my view, the language-conduit theory, as espoused by our decision in *Lopez v. Commonwealth*, 459 S.W.3d 867 (Ky. 2015), is limited to the situation where the declarant makes an oral or written statement contemporaneously through an interpreter and should not be extended to the present facts involving the non-contemporaneous translation of written documents.[7] Therefore, I would conclude the trial court erred by admitting the translated text messages over the defendants' hearsay and Confrontation Clause objections. However, I would further determine any such error was harmless beyond a reasonable doubt.

---

[7] Additionally, I note the existence of an ongoing split of authority among the federal circuit courts regarding the continuing validity of the language-conduit theory for the purpose of Confrontation Clause analysis in the wake of *Crawford v. Washington*, 541 U.S. 36 (2004). *Compare United States v. Orm Hieng*, 679 F.3d 1131, 1141 (9th Cir. 2012) *with United States v. Charles*, 722 F.3d 1319, 1328 (11th Cir. 2013). The 4-3 decision of the Minnesota Supreme Court in *State v. Lopez-Ramos*, 929 N.W.2d 414 (Minn. 2019), cited by the majority, *ante* at 24, "illustrates the divergent approaches" to this issue. *State v. Martinez*, 946 N.W.2d 445, 457 (Neb. 2020), *abrogated on other grounds* by *State v. Matteson*, 985 N.W.2d 1 (Neb. 2023). However, in the absence of definitive guidance by the Supreme Court, I maintain our decision in *Lopez* remains good law for the reasons expressed by the Ninth Circuit in *Orm Hieng*, 679 F.3d at 1141.

The present appeal involves the admissibility of translated text messages which is distinct from the situation where "a conversation or witness interview is being translated by a third party as it occurs[.]" Clifford S. Fishman & Anne Toomey McKenna, 5 *Jones on Evidence* § 38:1.50 (7th ed. 2024). There are potential hearsay and Confrontation Clause issues inherent in both situations which must be analyzed differently. *Id.*; *see also* Jeffrey Bellin, 30B *Fed. Prac. & Proc. Evid. (Wright & Miller)* § 7044 (2025 ed.) (explaining "[t]he proper analysis [of out-of-court translations] depends on context."). Professor Wharton's treatise aptly frames the issue as follows:

> [A] hearsay issue may arise when a witness is testifying about an out-of-court statement in another language that the witness did not understand but which was translated by someone else at the time it was spoken. Essentially, the witness would be testifying only about the translation—not the actual statement—and that testimony may be inadmissible hearsay. The critical question is whether the non-English speaker or the interpreter is viewed as the "declarant." If the declarant is the interpreter, then the statement is probably inadmissible hearsay. If the non-English speaker is the declarant, the statement may be admissible under a hearsay exception.

Barbara E. Bergman, Nancy Hollander & Theresa M. Duncan, 2 *Wharton's Criminal Evidence* § 6:7 (15th ed. 2024). In my estimation, the author of a text message or other writing cannot automatically be deemed the declarant of a subsequent non-contemporaneous translation. Thus, the language-conduit analysis under *Lopez* is inapplicable here.

In *Lopez,* a police detective and foreign language interpreter conducted a recorded interview with a non-English speaking defendant during which the

51

defendant, speaking through the interpreter, admitted to illegal sexual activity with a minor.  459 S.W.3d at 870.  Notably, the interpreter testified at trial "about his experience as interpreter . . . and that his translations were true and accurate."  *Id.*  However, the interpreter did not testify regarding the content of the defendant's statements at the interview.  *Id.*  Instead, the detective "testified that, based on [the interpreter's] translations, [the defendant] had admitted to having sex with [the minor]."  *Id.*

On direct appeal, we rejected the defendant's argument that the detective's "testimony was inadmissible hearsay because, as a non-Spanish speaking person, he did not have personal knowledge of what [the defendant] said but was relying on [the interpreter's] translation."  *Id.* at 873.  We further explained:

> [w]hen an interpreter is simply translating what a witness says, then the interpreter is acting merely as a conduit and, if the non-English speaking declarant's testimony would otherwise be admissible, the use of an interpreter to translate that testimony does not render it inadmissible.  If [the defendant] had been speaking English, his statement would be admissible as an admission by a party.  The mere fact that [the defendant's] statement was made in Spanish, then translated into English, does not make it any less of an admission.

*Id.*

The reasoning of *Lopez* was premised in large part on the pre-Rules[8] decision in *Fletcher v. Commonwealth*, 96 S.W. 855, 857 (Ky. 1906), which approved the use of a sworn interpreter as "mere conduit by which the

---

[8] The Kentucky Rules of Evidence were adopted in 1992.  *Mullins v. Commonwealth*, 956 S.W.2d 210, 211 (Ky. 1997).

52

testimony" of two non-English speaking witnesses "was conveyed to the grand jury." 459 S.W.3d at 873. In addition to the holdings of *Lopez* and *Fletcher*, our predecessor Court specifically articulated the traditional principle as follows:

> It is a well settled rule that **where one, through an interpreter, makes statements to another, the interpreter's statement**, **made at the time, of what was so said**, is competent evidence against the party.
>
> The interpreter need not be called to prove it, but the interpreter's statement, made at the time, may be proven by third persons, who were present and heard it.

*Sullivan v. Kuykendall*, 6 Ky. L. Rptr. 481, 82 Ky. 483, 489 (1885) (emphasis added). At common law, the language-conduit theory rested on principles of implied or adoptive agency. *Commonwealth v. Vose*, 32 N.E. 355 (Mass. 1892) ("When two persons who speak different languages, and who cannot understand each other, converse through an interpreter, they adopt a mode of communication in which they assume that the interpreter is trustworthy, and which makes his language presumptively their own."); *see also Guan Lee v. United States*, 198 F. 596, 601 (7th Cir. 1912). Importantly, the historical application of the language-conduit theory "was a limited exception" to the general hearsay rule which ordinarily "treated out-of-court statements made by an interpreter the same as any other out-of-court statements"[9] Bolitho, 49

---

[9] Indeed, several legal commentators have criticized the contemporary application and expansion of the language-conduit exception beyond its narrow origins. Bellin, 30B *Fed. Prac. & Proc. Evid.*, at § 7044 (observing the language-conduit theory "is essentially a court-created hearsay exception for translated statements" which is inconsistent with the rules of evidence and, "[a]s such, it is probably illegitimate and should be discarded."); Paul F. Rothstein, *Fed. Rules of*

N.M. L. Rev. at 204-05 (2019) (citing 3 John Henry Wigmore, *A Treatise on the Anglo-American System of Evidence in Trials at Common Law* § 812(3) (2d ed. 1923)).

Similarly, the contemporary decisions of foreign jurisdictions generally recognize "[t]his concept of the language conduit has been applied in cases in which it is a defendant who has made an admission or confession *through a translator*." *Correa v. Superior Court*, 40 P.3d 739, 746-47 (Cal. 2002) (emphasis added); *see also* Karen Moulding, *Admissibility of Testimony Concerning Extrajudicial Statements Made to, or in Presence of, Witness Through an Interpreter—Federal Cases*, 91 A.L.R. Fed. 2d 187 (2015) (collecting cases). In other words, "the task of a court in determining whether to admit a *contemporaneously translated statement* is to 'consider on a case-by-case basis whether the translated statements fairly should be considered the statements

---

*Evidence Rule 801* n.7 (2025 ed.) (criticizing the language-conduit theory as inconsistent with hearsay and Confrontation Clause jurisprudence); Zachary C. Bolitho, *The Hearsay & Confrontation Clause Problems Caused by Admitting What a Non-Testifying Interpreter Said the Criminal Defendant Said*, 49 N.M. L. Rev. 193, 214 (2019) (observing the language-conduit and agency "theories are fundamentally flawed, inconsistent with the law, and rest on faulty factual premises."); Gregory J. Klubok, *The Error in Applying the Language Conduit-Agency Theory to Interpreters Under the Confrontation Clause,* 89 St. John's L. Rev. 1399, 1401 (2015) ("The language conduit-agency theory's imputation of translated statements to the defendant improperly conflates the Confrontation Clause with the hearsay rules . . . . and has no basis in agency law."); Casen B. Ross, *Clogged Conduits: A Defendant's Right to Confront His Translated Statements*, 81 U. Chi. L. Rev. 1931, 1965 (2014) (arguing the current application language-conduit and agency theories rest on untenable legal fictions); Tom S. Xu, *Confrontation & the Law of Evidence: Can the Language Conduit Theory Survive in the Wake of Crawford?*, 67 Vand. L. Rev. 1497, 1519 (2014) ("There is no good justification for relaxing the Sixth Amendment standard when dealing with translated statements that would normally constitute testimonial hearsay, or for empowering judges to make a reliability determination that would ultimately avoid the confrontation requirement altogether.").

of the speaker[.]'" *Correa*, 40 P.3d. at 758-59 (quoting *United States v. Nazemian*, 948 F.2d 522, 527 (9th Cir. 1991) (emphasis added), *overruled in part on other grounds by Crawford*, 541 U.S. at 36; *see also United States v. Koskerides*, 877 F.2d 1129, 1135 (2nd Cir. 1989) (rejecting hearsay challenge where "[t]he interpreter translated [the defendant's] statements concurrently as made."). In such circumstances, "the prevailing view is that the translator is normally to be viewed as an agent of the defendant; hence the translation is attributable to the defendant as his own admission and is properly characterizable as non-hearsay[.]" *United States v. Da Silva*, 725 F.2d 828, 831 (2nd Cir. 1983).

To determine whether an interpreter is a mere conduit of language, the majority of jurisdictions consider the following four factors:

> [(1)] which party supplied the interpreter, [(2)] whether the interpreter had any motive to mislead or distort, [(3)] the interpreter's qualifications and language skill, and [(4)] whether actions taken subsequent to the conversation were consistent with the statements as translated.

*Nazemian*, 948 F.2d at 527; *United States v. Beltran*, 761 F.2d 1, 5 (1st Cir. 1985); *United States v. Alvarez*, 755 F.2d 830, 859 (11th Cir. 1985); *Da Silva*, 725 F.2d at 832. Under this test, hearsay rules and the Confrontation Clause are not implicated "as long as a translator acts only as a language conduit[.]" *United States v. Aifang Ye*, 808 F.3d 395, 401 (9th Cir. 2015). Conversely, if the language-conduit test is not satisfied or there is a sufficient basis to conclude the translation was inaccurate, then the translator or other qualified witness "must be [made] available for testimony and cross-examination[.]"

55

*United States v. Martinez-Gaytan*, 213 F.3d 890, 891 (5th Cir. 2000); *see also*

*Correa*, 40 P.3d at 748.

Turning to the present appeal, I remained unconvinced the language-conduit test applies here because the translation of text messages by Officer Guandique at Detective Burris's sole behest cannot be deemed a contemporaneous statement made by the defendants *through an interpreter*. Moreover, assuming *arguendo*, the four language-conduit factors are properly applicable, I cannot characterize Officer Guandique's translation of the text messages as a non-hearsay admission attributable to the defendants.

Specifically, under the first factor, Officer Guandique's language skills were not supplied to, or used by, the defendants to facilitate contemporaneous communication with another person. Moreover, there is no indication that Officer Guandique possessed any implied agency or authorization to speak for the defendants at the time he translated the text messages. Under the second factor, while I do not presume Officer Guandique harbored any intent to mislead or distort, his absence from these proceedings prevented any direct inquiry into his qualifications, credibility, veracity, and bias under the third factor. Further, under the fourth factor, I cannot conclude the defendants acted consistently with a translation that occurred outside of their presence.[10]

---

[10] Under the fourth factor, the Commonwealth argues the physical evidence and the defendants' subsequent statements were consistent with the translated text messages. However, this contention misapprehends the nature of the inquiry. The language-conduit analysis presumes the interpretation or translation occurs to facilitate contemporaneous communication between a non-English speaker and a third-party. *Nazemian*, 948 F.2d at 527 ("[W]hether actions taken subsequent to the conversation were consistent with the statements as translated."). The type of action

56

Indeed, there is no indication the defendants took any objective action in reliance upon the translations that would tend to demonstrate their accuracy.

Thus, I cannot deem Officer Guandique to have acted as a mere language-conduit through which the defendants conveyed a statement to another person. In my view, an out-of-court "written translation is a statement by a human being (the translator) . . . offered in court for the truth of what it is impliedly saying: that this translation represents accurately what the original speaker (or writer) actually said." Rothstein, *Fed. Rules of Evidence Rule 801* at n.7. Further, "[i]t would seem that hearsay logic, like Confrontation Clause logic, if rigorously applied, would demand that the accuracy of the translator and translation be subject to cross examination of the translator or the evidence is inadmissible." *Id.*

My analysis of the admissibility of the translation evidence does not end here, however. Although our evidentiary rules are silent on the proper method of admitting translations of foreign-language writings, I would review the question on the same basis "as that adopted by some courts for providing a transcript of a recording in English[.]" Tracy Bateman, et al., 12A *Fed. Proc., L. Ed.* § 33:577 (2025); *United States v. Zambrana*, 864 F.2d 494, 498 (7th Cir. 1988) ("This procedure is well suited to cases . . . where the transcript is an English translation of a foreign language conversation."). Indeed, writings and

---

consistent with a translated conversation should evince some objective reliance, ratification, or adoption of the translated language on the part of the non-English speaker. *See United States v. Romo-Chavez*, 681 F.3d 955, 960 (9th Cir. 2012) ("When evaluating this factor, we look to objective action rather than a party's litigation position.").

recordings are treated similarly under KRE 1001 which defines "[w]ritings and recordings" as "letters, words, or numbers, or their equivalent, set down by handwriting, typewriting, printing, photostating, photographing, magnetic impulse, mechanical or electronic recording, or other form of data compilation."

When, as here, a party seeks to admit the translation of an otherwise admissible writing or recording[11], the proper procedure requires the trial court and parties to "make an effort to produce an 'official' or 'stipulated' [translation], one which satisfies all sides." *United States v. Wilson*, 578 F.2d 67, 69–70 (5th Cir. 1978). "If such an 'official' [translation] cannot be produced, then each side should produce its own version of a [translation] or its own version of the disputed portions." *Id.* at 70. Additionally, "each side may put on evidence supporting the accuracy of its version or challenging the accuracy of the other side's version." *Id.*

To ensure the reliability of a translation for use at trial, the proponent of the evidence must present a witness sufficiently qualified in the relevant foreign language to verify the accuracy of the translation. *United States v. Garcia*, 20 F.3d 670, 673 (6th Cir.1994); *United States v. Gutierrez*, 367 F.3d 733, 735 (8th Cir. 2004); *United States v. Abonce-Barrera*, 257 F.3d 959, 964-65 (9th Cir. 2001); *see also* Clifford S. Fishman, *Recordings, Transcripts, & Translations as Evidence*, 81 Wash. L. Rev. 473, 503 (2006). Importantly, the presence of such a qualified witness at trial "presents no additional hearsay or

---

[11] I have no doubt the original Spanish-language text messages were admissible as a party admission under KRE 801A.

Confrontation Clause problems[] because the person who vouches for the accuracy of the translation is testifying in court." 5 *Jones*, at § 38:1.50. Moreover, "[d]efendants who object to the manner in which a translator has performed the difficult and delicate task of moving meaning between two languages have a number of tools at their disposal—Rule 702, *cross-examination*, and limiting instructions, to name a few."[12] *United States v. Khan*, 794 F.3d 1288, 1297 (11th Cir. 2015) (emphasis added).

In the present appeal, the admission of the translations through Detective Burris amounted to improper hearsay because he could "testify only about the translation [and] not the actual statement[.]" 2 *Wharton's*, at § 6:7. Additionally, Officer Guandique must be considered the declarant of the translated text messages because he did not act as a mere language-conduit. Therefore, I would hold the trial court erred by admitting the translations through the testimony of Detective Burris and would have further required the presence of Officer Guandique or another qualified witness at trial to obviate the hearsay and confrontation issues.

In conclusion, while I would have determined the trial court erred by admitting the translated text messages, I would nevertheless conclude any such error was harmless. While the defendants were improperly precluded from confronting Officer Guandique, the defendants failed to specifically identify any meaningful inaccuracies in the translation. Additionally, despite

---

[12] Federal Rules of Evidence 702 is the counterpart to KRE 702 which governs the admission of expert testimony.

ample notice and opportunity, the defendants did not produce their own translation of the text messages. In similar circumstances, appellate courts have refused to hear complaints regarding translation evidence where the defendant failed to identify specific inaccuracies or otherwise submit his or her own version of the translation. *Garcia*, 20 F.3d at 673; *United States v. Cruz*, 765 F.2d 1020, 1023 (11th Cir. 1985). Ultimately, the accuracy of the translation is the touchstone of the analysis. *See United States v. Font-Ramirez*, 944 F.2d 42, 48 (1st Cir. 1991).

Further, I agree with the majority that the Commonwealth presented overwhelming evidence of guilt. The statements obtained from the defendants at the interview with Detective Burris were particularly compelling in light of the physical and medical evidence adduced at trial. Therefore, I discern no reasonable possibility that the hearsay and confrontation errors relative to the translation evidence contributed to the defendants' convictions. *See Talbott v. Commonwealth*, 968 S.W.2d 76, 84 (Ky. 1998). Accordingly, I concur in result only.

Conley and Keller, JJ., join.

COUNSEL FOR APPELLANT ISABEL TZUNUX-ZACARIAS:

Timothy G. Arnold
Kathleen Schmidt
Assistant Public Advocates


COUNSEL FOR APPELLANT MARIO TZUNUX-ZACARIAS:

Laura Karem
Kathleen Schmidt
Assistant Public Advocates


COUNSEL FOR APPELLEE:

Russell M. Coleman
Attorney General of Kentucky

Matthew R. Krygiel
Assistant Attorney General